COMMONWEALTH vs. WILLIAM PAVAO.

No. 89-P-1098

Bristol. February 4, 1993. - June 11, 1993.

Present: PERRETTA, IRELAND, & LAURENCE, JJ.

*Practice, Criminal*, Argument by prosecutor, Instructions to jury.

At a murder trial, the prosecutor's material misstatement of the evidence
during closing argument was so prejudicial as to require a new trial,
where the misstatement did not go to a collateral issue but attributed
the intent necessary for murder to the defendant, where there was no
instruction to the jury that the statement was inappropriate and to be
disregarded, and where the misstatement could have made a difference
in the jury's conclusion. [581-583]

INDICTMENT found and returned in the Superior Court De-
partment on December 30, 1987.

The case was tried before *Cortland A. Mathers*, J.

*John J. Costello & Francis J. Hurley* (*Sheryl J. Dennis*
with them) for the defendant.

*Elspeth B. Cypher*, Assistant District Attorney, for the
Commonwealth.

PERRETTA, J. Because of a material misstatement of the
evidence in the prosecutor's closing argument at the trial on
indictments charging the defendant and Antonio Sousa with
the murder of James Barboza, we reverse the defendant's
conviction for murder in the second degree.[1]

1. *The facts*. On December 19, 1987, Antonio Sousa was
the host of a holiday party at the Sportsmen's II Lounge in
Swansea. The defendant and his wife were among Sousa's
guests. At some point in the evening, the Sousa party moved

[1]Antonio Sousa was found guilty of assault and battery. That conviction
is not before us.

into another area of the lounge where other patrons were drinking and socializing.

Shortly after midnight, the defendant and his wife argued. When the defendant went to the men's room, another patron, Steven O'Brien, asked the wife if there was a problem. O'Brien was not a member of the Sousa group. The defendant's wife responded to O'Brien by swearing at him. When the defendant reappeared, he and O'Brien had an angry exchange. It became apparent that — because of the hour, the amount of alcohol that had been consumed, and the atmosphere in general — trouble was imminent. O'Brien saw acquaintances, one of whom was the victim, James Barboza, and joined them. The defendant remained with his party.

Although the hostility between the men in the two groups had somewhat subsided, it was stoked by the women. As the Sousa party was leaving, the defendant's wife and Kelly Melia, a friend of Barboza's, attacked each other in the foyer of the lounge. Barboza rushed into the foyer, separated the women, and punched Sousa and the defendant, knocking them to the ground. Barboza returned to the lounge, and the defendant, Sousa, and the rest of their group went outside.

Sousa wanted everyone to go and get into their cars and leave. The defendant was pacing, perhaps even trying to return to the lounge. Another man, Dennis Costa, was walking with the defendant who was bleeding from the mouth and repeatedly saying, "I'm going to get him. I want to get him, he busted my teeth." They (Sousa, the defendant, and Dennis Costa) did not, however, go back into the lounge.

At closing time, about fifteen to twenty minutes later, Barboza and his group came outside. They were among the other patrons who were leaving, a crowd of from fifty to perhaps one hundred. Some were throwing bottles. Barboza walked quickly, but in the opposite direction of where he had parked his car. One of his friends, Jay Ouimette, followed him.

There are different versions of what happened next. The Commonwealth, through its witnesses, took the position that the defendant, Sousa, and Costa, had been waiting for

Barboza, that one of them lured him to the area of their car, that the defendant swung a tree limb at Barboza, that Sousa knocked him to the ground, and that the defendant beat Barboza with the limb while he was down.

For the defense, there was evidence to show that Barboza confronted the Sousa group as they were getting into their cars to leave. Barboza attempted to kick Sousa, but Sousa blocked the blow by grabbing and holding on to Barboza's leg. As this was happening a crowd was closing in on the defendant. He had a tree limb which he swung back and forth to keep the crowd at bay. The limb hit Barboza either just before or just as Sousa yanked his leg and flipped him to the ground, causing him to strike his head. As Barboza was trying to get up from the ground, he was hit a second time with the tree limb.

There was medical testimony that the cause of Barboza's death was myocardial contusion, consistent with having been struck by a blunt instrument, and cerebral edema, which could have been caused by Barboza hitting his head on the paved surface of the parking lot. On this evidence, the judge instructed the jury on murder in the first and second degree, manslaughter, self-defense, and, as to Sousa only, assault and battery.

2. *The closing argument.* In retracing the events of the night in question for the jury, the prosecutor (who is not counsel on this appeal) argued that Barboza was the defender of his much smaller friend, Steven O'Brien, who had the misfortune of attempting to help the defendant's wife. That act prompted the defendant's wife to "tell[] Steve O'Brien, take a hike . . . . My husband will kill you, get out of here," and to attack Kelly Melia in the foyer, triggering the brawl in the parking lot.

Although O'Brien gave various but consistent versions of his conversation with the defendant's wife (she swore at him, she told him to mind his own business), he made no statement even close to the prosecutor's exaggerated recount.[2]

---

[2]In the first telling of the conversation, O'Brien testified that the defendant's wife told him, " 'You better watch out for my husband, he had been

Standing alone, the remark would not invite reversal of the conviction. The defendant did not object, and at that point in the argument one might understandably let the statement pass for hyperbole. We will assume the characterization given to O'Brien's hearsay testimony was innocent and inconsequential.

To understand that what followed was intentional and prejudicial, it is necessary to relate in some detail a portion of the testimony of Dennis Costa who was called to testify by the Commonwealth. Although not formally declared hostile, Costa was a difficult witness for the prosecutor whose questions were, for the most part, leading. Costa was repeatedly asked to relate the defendant's statement to him after the fight in the foyer, "I'm going to get him. I want to get him; he busted my teeth."

During the questioning of Costa about the events of that night, the prosecutor had to refresh his recollection many times with a police report of a statement he had given. When asked whether he had to "restrain" the defendant from returning to the lounge after Barboza had hit him in the mouth, Costa insisted that he was simply pacing with the defendant and refused to accept the prosecutor's suggestion that force was necessary to keep the defendant from going back into the lounge. After this attempt to refresh Costa's recollection failed, the prosecutor sought to impeach Costa's credibility by reminding him of his statements to her that morning during an interview before trial. He remained firm in his testimony. He had not held the defendant back, that the defendant was "pacing," and that he, Costa, was walking alongside him.

Costa also testified that, the afternoon after the fight, the defendant asked him and Sousa to come to his house. During their conversation at that meeting, Sousa asked Costa if he

_____

in jail before, so you better watch out.' " The judge sustained the defendant's objection (a motion in limine had been granted to exclude any reference to the fact that the defendant had previously been incarcerated), denied his sidebar motion for a mistrial, and instructed the jury to disregard and put the statement from their mind.

had hit Barboza before he, Sousa, did. Sousa also said to the defendant, "Billy, you shouldn't have hit that kid with the stick." When asked for the defendant's response to Sousa, Costa answered, "He said that he was mad because he had broken his teeth."

Turning again to the defendant's statement, "I'm going to get him," the prosecutor asked Costa, "Was he also saying 'I'm going to *kill* that fucking nigger?' " That question drew an objection, which was sustained. Next came, "Do you recall what else he might have been saying?" Again Costa answered, "[H]e said that he wanted to *get* him." When the prosecutor demanded the exact words of the defendant, Costa answered, " 'I want to *get* that fucking nigger.' "

In arguing to the jury that the defendant and Sousa had a murderous intent, the prosecutor stressed that the defendant and Sousa had choices, that they could have left the area after the fight in the foyer. Instead, they chose to lie low, to lure Barboza into a confrontation. With Barboza helpless on the ground, the defendant struck him two or three times with the tree limb. The error is found in the final words of the argument: "I'd ask you, ladies and gentlement, to find Sousa and Pavao guilty of murder. Because after all, if nothing else, William Pavao is a man of his word. He said he was going to *kill* that f'ing nigger, and they did."

3. *Discussion.* "The consequences of prosecutorial error depend on a number of factors, such as: Did the defendant seasonably object to the argument? Was the prosecutor's error limited to 'collateral issues' or did it go to the heart of the case (*Commonwealth* v. *Shelley*, 374 Mass. 466, 470-471 [1978])? What did the judge tell the jury, generally or specifically, that may have mitigated the prosecutor's mistake, and generally did the error in the circumstances possibly make a difference in the jury's conclusions? See *Commonwealth* v. *Cifizzari*, 397 Mass. 560, 579-580 (1986); *Commonwealth* v. *Bourgeois*, 391 Mass. 869, 884-885 (1984). On numerous occasions, the impact of an improper final argument has been mitigated by the judge's forceful instructions to the jury that the argument was inappropriate and should

be disregarded. See, e.g., *Commonwealth* v. *Borodine*, 371 Mass. 1, 10 (1976), cert. denied, 429 U.S. 1049 (1977); *Commonwealth* v. *Domanski*, 332 Mass. 66, 69 (1954). See also *Commonwealth* v. *Brown*, 392 Mass. 632, 641-642 (1984). Contrast *Commonwealth* v. *Hoppin*, 387 Mass. 25, 31 (1982); *Commonwealth* v. *Hawley*, 380 Mass. 70, 82-86 (1980). All these considerations must be undertaken on a case-by-case basis . . . ." *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 (1987) (footnote omitted).

This misstatement did not go to a "collateral issue." *Ibid.* As stressed by the defendant's attorney in urging a mistrial, it attributed the intent necessary for murder to the defendant. Moreover, unlike the prosecutor's dramatized version of the dialogue between the defendant's wife and O'Brien, the prosecutor intended the jury to believe that the improper statement now in issue was true and accurate. See *Commonwealth* v. *Clary*, 388 Mass. 583, 590 (1983). In resisting the motion for a mistrial, the prosecutor acknowledged that Costa did not testify to those words on his direct examination but claimed that he did adopt the "I'm going to kill him" characterization during his cross-examination by Sousa's counsel. In view of the fact that the Commonwealth was seeking a murder conviction against Sousa on a joint venture theory, it is not surprising that Sousa's attorney interjected that he would not have said that, meaning that he would not have asked Costa to accept the prosecutor's characterization of the defendant's statement.

Further, there was no instruction to the jury that the statement was inappropriate and to be disregarded. Rather, the judge's instruction allowed the jury to reflect upon the statement in considering the defendant's intent: "[T]he district attorney in her closing, in quoting the defendant Pavao said, 'I'm going to kill,' rather than 'get.' If your memory of the evidence is that that was said in this case, then you may consider it as a part of her argument. If your memory is that the word 'kill' was not used, and I will go so far as to say that would comport with my recollection, but, again, it's your memory, if the word 'kill' was not used, then you must cer-

tainly disregard all that altogether, because the word 'kill' would carry legal implications that the word 'get' would not convey and [sic] as you will see from my instructions."

But the jury had heard the word "kill." The prosecutor had used it in a question put to Costa during that part of her examination where Costa's recollection was being refreshed and his credibility impeached with a police report on whether he had to "restrain" the defendant from returning to the lounge. Although the question, "Was he also saying 'I'm going to kill . . .'" was excluded when asked, the jury was never given any reason for the exclusion. The instruction prompted by the prosecutor's closing argument was simply that, if the jury remembered the statement as having been made, it could be considered in determining the defendant's intent.

Finally, we think that in the circumstances of this case the error could have made a difference in the jury's conclusion. Notwithstanding the medical testimony concerning the cause of Barboza's death and the Commonwealth's theory of joint venture murder, the jury found Sousa guilty of assault and battery. Two hours and forty-five minutes into their deliberations, the jury requested that the judge "define malice for us again, and also refresh our memory on the differences between manslaughter and second degree murder." We need not set out the entire explanation given by the judge. However, the final distinction heard by the jury was that second degree murder requires malice, intent, whereas in manslaughter one acts from "passions of fear, anger, fright, or nervous excitement, when there is no time to deliberate." The jury returned with its verdicts thirty minutes later.

4. *Other claims of error.* The other claimed errors which relate to the denial of the defendant's motion to sever need not be considered as they will not recur at retrial.

*Judgment reversed.*
*Verdict set aside.*