## COMMONWEALTH vs. RICKY COREN.

Suffolk. March 8, 2002. - September 10, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SOSMAN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Argument by prosecutor. *Firearms.*

Evidence at a murder trial was sufficient to support the verdict of guilty of murder in the first degree, on a theory of deliberate premeditation [729-730]; however, material misstatements of the evidence by the prosecutor in his closing argument required reversal of the defendant's conviction, where defense counsel made a timely objection to the prosecutor's misstatements, where the judge declined to give particularized instructions to neutralize the prosecutor's argument, and where some of the misstatements went to the heart of the case [730-733].

At a criminal trial, the evidence was insufficient to support the defendant's conviction of possession of a firearm, where a finding beyond a reasonable doubt that the defendant possessed a firearm on a public sidewalk, and not within his "residence," could not be made; consequently, the defendant's motion for a required finding of not guilty on this charge should have been allowed. [733-736]

INDICTMENTS found and returned in the Superior Court Department on June 28, 1996.

The cases were tried before *James D. McDaniel, Jr.,* J.

*Janet H. Pumphrey* for the defendant.

*Alex G. Philipson,* Assistant District Attorney, for the Commonwealth.

CORDY, J. A jury convicted Ricky Coren of murder in the first degree in the killing of his friend, Hosea Lockhardt, on the theory of deliberate premeditation. Coren was also convicted of unlawfully possessing a firearm and ammunition in violation of G. L. c. 269, §§ 10 (*a*) and (*h*).[1]

---

[1] Coren was sentenced to a term of life imprisonment on the murder conviction, and a concurrent term of from four and one-half to five years on the gun charge; the ammunition charge was filed with Coren's consent and is not part of this appeal. See *Commonwealth* v. *Johnson,* 435 Mass. 113, 115 n.2 (2001). See also note 14, *infra.*

On appeal, Coren claims that the trial judge erred (1) in his jury instructions on circumstantial evidence, accident, and constructive possession; (2) by refusing to instruct the jury on intoxication; (3) by illustrating a point in his jury instruction on deliberate premeditation with a hypothetical situation similar to the facts of this case; and (4) by denying Coren's motion for a required finding of not guilty on the firearm possession charge due to insufficient evidence. Coren also claims that the prosecutor made prejudicial misstatements of the evidence in his closing argument, and that the evidence was insufficient to support the conviction of murder in the first degree on a theory of deliberate premeditation. Finally, Coren asks us to invoke our extraordinary power pursuant to G. L. c. 278, § 33E, to reduce the degree of guilt, or to order a new trial.

We do not reach all of Coren's claims because, although we conclude that the evidence was sufficient to support the verdict of guilty of murder in the first degree, material misstatements of the evidence by the prosecutor in his closing argument require that the conviction be reversed. We also conclude that the evidence was insufficient to support Coren's conviction of possession of a firearm, and his motion for a required finding of not guilty on that charge should have been allowed.

1. *Facts.* We summarize the evidence in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with the issues raised. *Commonwealth* v. *Fowler*, 431 Mass. 30, 31 (2000).

a. *The Commonwealth's case.* The Commonwealth proceeded on the theory that Coren deliberately shot his friend, Lockhardt, in a hallway on the third floor of Coren's home during an argument over cocaine.

Coren, Lockhardt, and several others were socializing and drinking alcohol in Coren's bedroom on the third floor of 50 Evans Street in the Dorchester section of Boston during the evening hours of July 1, 1994. Coren and Lockhardt had also done "a couple of lines" of cocaine and there was evidence that, earlier that day, Coren had sold cocaine to Curtis Fox and Barry Mackey, both of whom spent time at 50 Evans Street that evening.

Marlayna McDuffie arrived at 50 Evans Street with some

beer and a bottle of rum sometime between 2 A.M. and 3 A.M. on the morning of July 2. Following a brief discussion with Coren's mother in the kitchen, McDuffie made her way upstairs to the third floor. When she entered Coren's bedroom, Coren was busily "looking for something" and Lockhardt was drinking a beer. According to McDuffie, Coren was looking everywhere for "it" and "telling [Lockhardt] he [could not] find it." McDuffie recalled Lockhardt saying, "Let me get it. Let me have it," "Give it to me," but she could not say what "it" was.

Coren and Lockhardt then stepped out of the bedroom and into the hallway on the third floor. McDuffie remained behind in the bedroom for less than five minutes before walking out and announcing that she was leaving. She walked past Coren and Lockhardt on her way down the stairs and, as she passed by, noticed Coren holding the handle of a gun at waist level while Lockhardt held on to the barrel. The gun was pointed at Lockhardt's stomach. The two men were standing face to face, about an arm's length apart, and were "bickering." McDuffie overheard part of their conversation in which Coren had said, "I'm not going to give it. I can't find it, I'm not giving it to you," and Lockhardt stated, "Give it to me."

McDuffie began descending the stairs and, before she reached the bottom, she heard a "bang" from upstairs. The noise was "loud," "like a firecracker," and it frightened McDuffie. She immediately rushed out of the house and encountered Mackey, who had just returned to 50 Evans Street. McDuffie told Mackey not to "go up there" because Coren "was upset," he was "missing his product," and he "had fired [a] gun." She also told him that her ears were ringing from the loud noise and that she thought "something [had] happened." McDuffie then asked Mackey to drive her home, which he did.

Following the shooting, Coren's brother and sister, both of whom were inside the house at the time, dialed 911, reporting that "someone [was] hurt" on the front porch of 50 Evans Street. When police arrived minutes later, they found Coren performing CPR on Lockhardt on the walkway in front of the steps to Coren's house. Lockhardt had been shot once in the right side, just below the rib cage.

Sergeant David Murphy of the Boston police department,

who was the first to arrive on the scene, asked Coren what had happened and Coren said that Lockhardt had suffered a seizure. Murphy noted that Lockhardt had no pulse, was not breathing, and had what appeared to be a gunshot wound. Coren and Murphy continued to administer CPR for approximately ten to fifteen minutes until an ambulance arrived and transported Lockhardt to a hospital. Lockhardt later died of internal bleeding caused by a single gunshot wound to the right upper abdomen. The medical examiner testified that Lockhardt sustained a contact wound, which would indicate that the barrel of the gun was pressed against his body at the time the shot was fired.

In securing the scene after Lockhardt had been transported to the hospital, officers recovered a black .38 caliber revolver from the backyard of 50 Evans Street. As the officers investigated the area behind the house, Coren "came running out the back and asked what [they] were doing back there." He spoke to the officers from the back porch and told them that there was "something back there" and that he was not "going to get blamed for this." In a corner of the backyard, lying on a tarpaulin, officers discovered the handgun used to shoot Lockhardt. The six-shot revolver contained one discharged casing, three live rounds, and two empty chambers.

After being read his Miranda rights and speaking to police briefly at the scene, Coren agreed to accompany the officers to the police station. Following another recitation and acknowledgment of his Miranda rights, Coren made a tape-recorded statement to police that lasted approximately forty minutes.[2]

Coren told police that the gun they had found in the backyard of 50 Evans Street belonged to him and that he had taken it from Lockhardt's hand on the steps and tucked it in the back of his waistband while he performed CPR. He stated further that he had left Lockhardt with his brother momentarily while he hid the gun in the backyard where it was found. When police asked Coren why he had hidden the gun, he answered, "Because it was mine. I'm the one who's going to get in trouble because I took it out of my home and let him use it and that was the

---

[2]This tape-recorded statement was played for the jury and a transcript was provided to aid them in understanding the recording.

wrong thing to do. I didn't think he was going to get hurt, man."

Approximately one month after the shooting, Curtis Fox (who had been at 50 Evans Street the night of the shooting) approached Coren and confronted him "about why he shot that gun off." Fox asked Coren what he was "doing with the gun out," and Coren replied that he "shot it off to see if it really worked."

b. *The defense.* Coren did not testify at trial. Instead he called two witnesses and relied on his tape-recorded statement to police to support alternative versions of the events of July 2. One of those versions was that Lockhardt was killed elsewhere by others from whom he was trying to collect a debt, and staggered back to 50 Evans Street; another was that the gun fired accidentally, while Coren and Lockhardt "bickered" in the hallway, and that Coren had no intent to commit murder.

In his tape-recorded statement, Coren told police that the gun they had found in the backyard was his and that he had lent it to Lockhardt on the night of the shooting so that Lockhardt could collect a debt. Coren stated that Lockhardt had made a telephone call from 50 Evans Street that night in order to set up a meeting to collect the debt. He also told police that shortly after Lockhardt left 50 Evans Street with the gun, he heard five gunshots and immediately thought of Lockhardt. Coren stated that he rushed downstairs, opened the door, and Lockhardt was "right there" on the steps.

McDuffie, who was the Commonwealth's principal witness and a long-time friend of Coren, also testified that after she heard the shot on the third floor of 50 Evans Street and rushed home, she received a telephone call from Coren and Lockhardt sometime between 3:30 and 3:45 A.M. She stated that Coren told her "everything's all right. Everything is fine" and she could hear Coren and Lockhardt laughing in the background. She then spoke briefly to Lockhardt on the telephone and he confirmed that "everything's all right . . . [e]verything is squashed."

2. *The prosecutor's closing argument.* In his closing argument, the prosecutor stated:

"Hosea Lockhardt is saying, 'Give it to me, give it to

me,' *and I suggest because he's saying to his friend, 'Get the gun away from me, don't shoot.'* . . . 'Where is it?,' is what the defendant is saying. 'I'm not going to give it to you.' 'Where is it, where are my drugs? Where are the drugs I had in the bureau? Where are they?'" (Emphasis added.)

He later stated:

"[Coren is] missing his cocaine. And the only ones in the house at that time are Marlayna McDuffie, the defendant, and Hosea Lockhardt.[3] So he assumes it's his friend, Hosea Lockhardt. *He takes the gun, and he's angry. And he's looking for it.* . . . *He's yelling, 'I can't find it. Where is it?' He pulls out the gun. Hosea Lockhardt says, 'Give it to me, give it to me. Don't'* — *and I suggest to you, 'don't shoot.'* 'What are you?' 'No, I'm not going to give it to you.' 'Where is it?' Hosea would be pushing that gun away. [Coren is] pushing it into Hosea's stomach. Marlayna sees this. He pulls the trigger." (Emphasis added.)

There was no evidence at trial that Lockhardt ever said either "don't" or "don't shoot." The only evidence of the dialogue between Coren and Lockhardt on the third floor was that provided through McDuffie's testimony and, according to Mc-Duffie, the only words she heard Lockhardt say during the "bickering" in the hallway were, "Let me get it," "Give it to me," or "Let me have it."[4] Similarly, there was no evidence that Coren was "yelling" as the prosecutor stated. Rather, Mc-Duffie testified that Coren's voice was not raised and that "[i]t wasn't loud or anything. I could hardly hear." Nor was there evidence that Coren was pushing the gun into Lockhardt's stomach while Lockhardt was trying to push it away. McDuff-

---

[3]The evidence at trial was otherwise. In fact, the evidence was that there were as many as seven adults and two children at the Coren house at the time of the incident. We note, however, that it is likely the prosecutor simply misspoke in this instance and used the word "house" in place of the word "room," which would have conveyed an accurate description of the evidence.

[4]Marlayna McDuffie gave several slightly different accounts of the precise statements she overheard between Coren and Lockhardt. These three phrases represent the varying formulations of Lockhardt's statement as they appear in McDuffie's testimony.

ie's testimony was that Coren was holding the handle of the gun while Lockhardt was holding the barrel, and that "[i]t was relaxed . . . they were just standing there. Like down by [Coren's] side."[5]

In his closing, the prosecutor also discussed the testimony of Curtis Fox, specifically with regard to an exchange between Fox and Coren approximately one month after the shooting. The prosecutor stated: "And, then, a month later, [Fox] saw [Coren] on the stairs; and he said, 'What happened? What did you do? *What did you do it for?*' [To which Coren replied,] 'I just wanted to see if the gun worked.' " (Emphasis added.) This description of the conversation differed from the evidence adduced at trial. Fox testified that he asked Coren, "*What [were] you doing with the gun out?*" to which Coren replied, "I took it out to see if it would work" (emphasis added).[6]

Finally, the prosecutor repeatedly referred to Coren as a liar in his closing argument. For example, he stated, "You have [Coren's] statement, what he said in his statement, the lies that he told. . . . [L]ies after lies after lies in that statement. . . . Once he finds out about his friend being dead, sure, he's upset for a brief second, and then he continues to lie and to lie. . . . He's caught up in the lie."

3. *Discussion.* a. *Sufficiency of the evidence of murder in the first degree.* Coren claims that the evidence at trial was insufficient to support his conviction of murder in the first degree based on a theory of deliberate premeditation. We examine the evidence introduced up to the time the Commonwealth rested its case, *Commonwealth* v. *Borans*, 379 Mass. 117, 134 (1979), and apply the well-established test "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Lati-*

---

[5]While the inference that Coren pushed the gun into Lockhardt's stomach was supported by the medical examiner's testimony that Lockhardt had sustained a "contact wound," there was no evidence to support the statement that Lockhardt was pushing the gun away at the time.

[6]Fox also testified that Coren told him "he shot [the gun] off to see if it really worked."

*more*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979). We conclude that there was sufficient evidence to warrant submitting the case to the jury on the question whether Coren committed murder with deliberate premeditation.

A defendant deliberately premeditates where he forms a plan to kill after deliberation and reflection, but no particular length of time is required in order to show deliberate premeditation. See *Commonwealth* v. *Palmariello*, 392 Mass. 126, 143 (1984), quoting *Commonwealth* v. *Caine*, 366 Mass. 366, 374 (1974). It may be a matter of days, hours, or even seconds. See *Comonwealth* v. *Palmariello*, *supra*. "It is not so much a matter of time as of logical sequence. First the deliberation and premeditation, then the resolution to kill, and lastly the killing in pursuance of the resolution; and all this may occur in a few seconds." *Id.* at 143, quoting *Commonwealth* v. *Tucker*, 189 Mass. 457, 495 (1905). In addition, obtaining and using a weapon at close range, particularly a gun, is "sufficient generally to permit an inference of premeditation." *Commonwealth* v. *Johnson*, 435 Mass. 113, 119 (2001), quoting *Commonwealth* v. *Stewart*, 398 Mass. 535, 541 (1986).

The jury could have found the following facts. Coren was a cocaine dealer who had sold drugs to two friends earlier in the evening and later became upset when he could not find his remaining "product." He began looking around his room for the missing cocaine and eventually ended up "bickering" with Lockhardt in the hallway about it. There, Coren pointed his gun at Lockhardt's stomach, and Lockhardt held the barrel of the weapon and stated, "Give it to me." Coren then fired one shot into Lockhardt's abdomen. These facts are sufficient to support a finding of murder with deliberate premeditation. See *Commonwealth* v. *Johnson*, *supra* at 119; *Commonwealth* v. *Good*, 409 Mass. 612, 618 (1991).

b. *The prosecutor's closing.* Prosecutors must limit the scope of their arguments to facts in evidence and inferences that may be reasonably drawn from the evidence. See *Commonwealth* v. *Good*, *supra* at 623, and cases cited. They must also take caution not to misstate the evidence. See *id.* "In analyzing a claim of improper argument, the prosecutor's remarks must be viewed

in light of the 'entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial.' " *Commonwealth* v. *Lamrini*, 392 Mass. 427, 432 (1984), quoting *Commonwealth* v. *Bourgeois*, 391 Mass. 869, 885 (1984). We conclude that the prosecutor exceeded the scope of proper argument by misstating important aspects of the testimony beyond inferences that might reasonably have been drawn from the evidence, and thereby committed error.

The consequences of prosecutorial error depend on a number of factors, such as: "Did the defendant seasonably object to the argument? Was the prosecutor's error limited to 'collateral issues' or did it go to the heart of the case . . . ? What did the judge tell the jury, generally or specifically, that may have mitigated the prosecutor's mistake, and generally did the error in the circumstances possibly make a difference in the jury's conclusions?" (Citations omitted.) *Commonwealth* v. *Kelly*, 417 Mass. 266, 271 (1994), quoting *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 (1987). "All of these considerations must be undertaken on a case-by-case basis . . . ." *Commonwealth* v. *Kozec, supra.* Application of these factors persuades us that a new trial is necessary. See *Commonwealth* v. *Kelly, supra* at 271.

Defense counsel made a proper and timely objection to the prosecutor's misstatements in his closing argument.[7] The judge declined to give particularized instructions to neutralize the errors in the prosecutor's argument, choosing instead to rely on standard instructions to the effect that statements made by attorneys during closing arguments are not evidence. See *id.*[8]

Most importantly, some of the misstatements went to the heart of the case. This is particularly true with regard to the prosecutor's suggested attribution of the words "don't shoot" to Lockhardt in the moments before the shooting. Where there

[7]The defense attorney objected, "He put words in people's mouths . . . which were not in any way, shape, or form part of their testimony."

[8]On numerous occasions, the impact of an improper closing argument has been mitigated by the judge's forceful instructions to the jury that the argument was inappropriate and should be disregarded. See, e.g., *Commonwealth* v. *Borodine*, 371 Mass. 1, 10, cert. denied, 429 U.S. 1049 (1977); *Commonwealth* v. *Domanski*, 332 Mass. 66, 69 (1954). See also *Commonwealth* v. *Brown*, 392 Mass. 632, 641-642 (1984). Contrast *Commonwealth* v. *Hoppin*, 387 Mass. 25, 31 (1982); *Commonwealth* v. *Hawley*, 380 Mass. 70, 82-86 (1980).

were no eyewitnesses to the fatal shooting and the defendant presented a defense based in part on the accident, the potential effect of the prosecutor's repeated suggestion that Lockhardt was pleading with Coren not to shoot him can hardly be overestimated.

We have stated that "[p]rosecutors should use caution in speculating as to what conversations might have occurred, and should refrain from presenting hypothetical conversations not fairly inferable from the evidence before the jury." *Commonwealth* v. *Pope*, 406 Mass. 581, 587 (1990), and cases cited. The prosecutor must "tailor his comments so that they remain 'properly grounded in the evidence.' " *Id.*, quoting *Commonwealth* v. *Corriveau*, 396 Mass. 319, 337 (1985). Although we have also recognized circumstances in which "counsel may present an argument by dramatizing it in imaginary dialogue or illustrating it by imaginary occasions," the hypothetical accounts must be in accord with inferences that could be fairly drawn from the evidence at trial. *Commonwealth* v. *Pope*, *supra* at 587, quoting *Commonwealth* v. *Clary*, 388 Mass. 583, 590 (1983). See *Commonwealth* v. *Good*, *supra* at 625-626. This was not such an occasion. Whether the prosecutor simply misstated the evidence of the conversation in the hallway (which clearly did not include the words "don't" or "don't shoot"), or was speculating about what Lockhardt meant when he said, "Give it to me," or, was presenting the jury with hypothetical conversation between Lockhardt and Coren just before the shooting, he strayed far afield from the evidence and the reasonable inferences therefrom on a critical point.

The prosecutor's argument in this case is analogous to that in *Commonwealth* v. *Pavao*, 34 Mass. App. Ct. 577 (1993), where a prosecutor's critical misstatement of the evidence during closing argument led to reversal. The evidence in the *Pavao* case was that the defendant had told a witness at the scene that he was going to "get" the victim. *Id.* at 581. In his closing argument however, the prosecutor referred to the defendant as having said that he was going to "kill" the victim. *Id.*

The misstatement in *Pavao*, similar to the prosecutor's remarks here, did not go to a "collateral issue," but rather to a central issue in the case. See *id.* at 582. There, the judge specifically discussed the prosecutor's statement in his charge to the

jury telling them that it was their memory that controlled whether the word "kill" had been used, and that its use did not comport with his recollection of the evidence. In spite of this instruction, the defendant's conviction was reversed by the Appeals Court, which concluded that "the error could have made a difference in the jury's conclusion." *Id.* at 583. We need not decide whether such a pointed instruction would have been sufficient to counteract the prosecutor's misstatements here, as nothing beyond a general instruction was given.

The prosecutor's other statements mischaracterizing the evidence of the critical exchange between Coren and Lockhardt in the hallway just before the shooting, including the statement that Coren was "yelling" and that he was pushing the gun into Lockhardt's stomach as Lockhardt was pushing it away, add further weight to the potential for prejudice. While these misstatements, if standing alone, might not warrant reversal of the judgment of conviction, see *Commonwealth v. Good*, 409 Mass. 612, 626 (1991); *Commonwealth v. Kozec*, 399 Mass. 514, 522 (1987), combined with the prosecutor's improper characterization of Lockhardt's final words, they confirm our view that the closing argument was, as a whole, unduly prejudicial.

Where it cannot be said with assurance that the prosecutor's improper remarks in closing argument could not have influenced the jury to convict, the judgment of conviction cannot stand. See *Commonwealth v. Kelly*, 417 Mass. 266, 272 (1994). At the very least, the prosecutor's repeated use of the phrase "don't shoot" to describe Lockhardt's statements in the moments before the shooting, may have made a difference in the jury's conclusions. Coren must therefore be afforded a new trial on the murder indictment.[9,10]

---

[9]Coren also complains that the prosecutor repeatedly called him a "liar" during his closing argument. While strong indications of the prosecutor's own opinions regarding the defendant's veracity have been found to be improper, see *Commonwealth v. Waite*, 422 Mass. 792, 801-802 (1996), where the evidence clearly supports the inference that the defendant lied, the prosecutor may fairly comment on it. *Commonwealth v. Obershaw*, 435 Mass. 794, 807 (2002). There was no error.

[10]The prosecutor's inaccurate recitation of the testimony of Curtis Fox was

c. *Sufficiency of the evidence of possession of a firearm.* Coren claims that the judge erred in denying his motion for a required finding of not guilty on the firearm possession charge (G. L. c. 269, § 10 [*a*]). We agree.

General Laws c. 269, § 10 (*a*), criminalizes the unlicenced possession of a firearm outside "[one's] residence or place of business." We have defined the term "residence" to include all areas in and around a defendant's property, including outside areas, over which the defendant retains exclusive control. See *Commonwealth* v. *Dunphy*, 377 Mass. 453, 459 (1979). Public streets, sidewalks, and common areas to which occupants of multiple dwellings have access, on the other hand, are not considered part of one's residence. See, e.g., *Commonwealth* v. *Statham*, 38 Mass. App. Ct. 582, 585 (1995) (evidence that defendant was on street or sidewalk at time he discharged firearm sufficient for purposes of G. L. c. 269, § 10 [*a*]); *Commonwealth* v. *Samaras*, 10 Mass. App. Ct. 910 (1980) (possession of gun on sidewalk in front of house sufficient for purposes of G. L. c. 269, § 10 [*a*]). See also *Perry* v. *Medeiros*, 369 Mass. 836 (1976) (flight of exterior stairs used by occupants of several apartments in same building characterized as "common stairway").[11]

In this case, Coren's residence is a multi-level single-family home with a front porch and stairs leading down to a stone landing level with and leading to a public sidewalk. The only evidence that Coren possessed a firearm outside of the third-floor hallway of his residence comes in his own tape-recorded statement to police after the shooting. Specifically, he told the police that he took the gun out of Lockhardt's hand and tucked it in his (Coren's) "back" while he administered CPR, and "when my brother came down he took over and did the CPR. I

not prejudicial when viewed in the context of the entire closing argument. It is clear in that broader context that the prosecutor fairly portrayed the import of that testimony, which was not that Coren had confessed to shooting Lockhardt, but that he had admitted to shooting the gun on that day to see whether it worked.

[11]The judge correctly instructed the jury on this point, stating: "[R]esidence includes not only the house . . . but the curtilage, that is, the yard around it. His residence does not include the common sidewalk or the street."

went in and sat the [gun] in the backyard and came back out from the backyard."[12] Based on these statements, the critical question is whether Lockhardt was within the boundaries of the residence when Coren says he took the gun from him to administer CPR. On this point, Coren's statements are unrevealing. He told police that he found Lockhardt "on the staircase . . . grabbed him and . . . put him on the ground." He further stated that he "picked [Lockhardt] up off the stairs . . . and laid him on the ground" in order to administer CPR. The ground could have been the landing which was within the residence, or the sidewalk beyond it.

In order to make the inferential jump from Coren's statements to a finding that he possessed the gun outside of his residence, the Commonwealth was required to produce evidence that the "ground" to which Coren was referring in his statement was outside of his residence. In other words, the Commonwealth had to show that when Coren took the gun from Lockhardt and tucked it in his "back," he did so on the public sidewalk, and not within his "residence" as defined by our case law. After a careful review of the evidence adduced at trial, we conclude that the evidence was insufficient to permit a rational trier of fact to make such a finding beyond a reasonable doubt.

In addition to Coren's statements, the testimony of several police officers established the location of Lockhardt's body, and thus the position from which Coren would have taken the gun.[13] The officers' testimony, however, was equally unrevealing as to the precise location of Lockhardt's body vis-à-vis the residence, and was insufficient to sustain the Commonwealth's burden of proving beyond a reasonable doubt that the gun was possessed outside of the residence. For example, Sergeant David Murphy testified first that Lockhardt was "lying on the sidewalk," but later stated that Lockhardt was lying on "the walkway at the bottom of the stairs." Officer Lori Wash testified that Lockhardt

---

[12]The "backyard" was clearly within Coren's "residence," and there was no evidence to support a finding that Coren reached the backyard by traveling outside the residence.

[13]Photographs of the stairs, walkway, and sidewalk in front of 50 Evans Street were admitted in evidence. These photographs depict an extended front landing and yard between the steps of 50 Evans Street and the sidewalk, and do not add to the evidence supporting the Commonwealth's case.

was "lying on the sidewalk . . . [with] one of his legs . . . on the stairwell," while Officer Michelle Williams testified only that Lockhardt was "[o]n the ground" in front of 50 Evans Street.

The jury were thus left with only conjecture and surmise on which to base their verdict on this charge. Such a verdict would be improper. *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965), quoting *Commonwealth* v. *O'Brien*, 305 Mass. 393, 401 (1940) ("if, upon all the evidence, the question of the guilt of the defendant is left to conjecture or surmise and has no solid foundation in established facts, a verdict of guilty cannot stand"). See *Commonwealth* v. *Armand*, 411 Mass. 167, 170 (1991). Consequently, a required finding of not guilty should have been entered by the judge. *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979).

4. *Conclusion.* While the evidence was sufficient to support the verdict of guilty of murder in the first degree, on a theory of deliberate premeditation, material misstatements of the evidence by the prosecutor in his closing argument require that the conviction be reversed, the verdict set aside, and the case remanded to the Superior Court for a new trial. In addition, because the evidence was insufficient to support Coren's conviction of possession of a firearm, pursuant to G. L. c. 269, § 10 (*a*), his motion for a required finding of not guilty on this charge should have been allowed. We reverse the conviction of possession of a firearm and order that a judgment of not guilty enter on this charge.[14]

*So ordered.*

---

[14]Coren was also convicted of illegal possession of ammunition in violation of G. L. c. 269, § 10 (*h*), as appearing in St. 1990, c. 511, § 3, and this conviction was filed with his consent. See note 1, *supra.* While St. 1998, c. 180, § 69, rewrote § 10 (*h*), effective October 21, 1998, Coren was indicted under the earlier version, because the alleged offense occurred on July 2, 1994. See *Commonwealth* v. *Feijoo*, 419 Mass. 486, 487 n.1 (1995). Because the version of the statute in effect on July 2, 1994, contained no requirement that a defendant be outside of his or her residence at the time of illegal possession, our reversal of the gun possession conviction has no bearing on the conviction of illegal possession of ammunition.