\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\*

**Electronically Filed
Supreme Court
SCAP-14-0000935
29-JUN-2018
08:00 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Plaintiff-Appellee,

vs.

GERALD L. AUSTIN,
Defendant-Appellant.

SCAP-14-0000935

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-14-0000935; CR. NO. 12-1-0127)

JUNE 29, 2018

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.[1]

<u>OPINION OF THE COURT EXCEPT AS TO PART III(D)(3)
AND OPINION OF NAKAYAMA, J., AS TO PART III(D)(3), IN WHICH
RECKTENWALD, C.J., JOINS</u>

Defendant-Appellant Gerald L. Austin (Austin) appeals

the judgment of the Circuit Court of the First Circuit (circuit

---

[1]     Justice Nakayama, joined by Chief Justice Recktenwald in full and by
Justice McKenna, except as to Part III(D)(3), writes for the majority of the
court except as to Part III(D)(3).  Justice Pollack, joined by Justice McKenna
in full and Justice Wilson in part, concurs in the judgment and writes for the
majority of the court with respect to the issue addressed in Part III(D)(3) of
Justice Nakayama's opinion.  Justice Wilson dissents in all other respects.

court) convicting him of murder in the second degree and sentencing him to an extended sentence of life imprisonment without the possibility of parole.  On appeal, Austin asserts five points of error:  (1) the circuit court abused its discretion in allowing Plaintiff-Appellee State of Hawaiʻi (the State) and its witnesses to refer to Edith Skinner (Skinner) as the "victim" or "murder victim" at trial; (2) the circuit court erred in excluding the statements of Anne Wanous (Wanous) as hearsay; (3) the circuit court erred in refusing to instruct the jury on the lesser included offenses of manslaughter and assault; (4) the circuit court erred in denying Austin's motion for a new trial because the prosecutor engaged in several acts of misconduct during closing arguments; and (5) the circuit court erred in sentencing Austin to an extended sentence of life imprisonment without the possibility of parole in violation of the ex post facto clause of the United States Constitution and Hawaiʻi Revised Statutes (HRS) § 1-3.

For the reasons discussed below, we agree that Austin's extended sentence of life imprisonment without the possibility of parole violated the ex post facto clause of the United States Constitution and HRS § 1-3.  But, we conclude that Austin's other points of error do not warrant vacating his conviction. Therefore, we affirm in part and vacate in part the circuit court's June 18, 2014 Judgment, Guilty Conviction, and Sentence

2

and remand the case to the circuit court for resentencing.

## I.   BACKGROUND

Skinner was born on April 16, 1908, and was eighty-one years old at the time of her death in 1989.  Skinner did not have any family in Hawaiʻi, but she had a son, Stephen Skinner, who lived in California and with whom she spoke every weekend.  Skinner had several close friends and enjoyed baking, playing bridge, and swimming at the Elks Club.

Skinner lived alone in Apartment 706 at the Makua Aliʻi Senior Center located at 1541 Kalākaua Avenue, which was generally restricted to low-income tenants over the age of sixty-two.  In 1989, the building was secured by an interphone system whereby visitors would call the apartment that they wanted to visit and the resident could let them in.  Upon entering the building, visitors could access any floor they wanted.

On the afternoon of July 25, 1989, Skinner's body was discovered in her apartment after two neighbors noticed that she had not picked up the newspaper from her front door and that she did not respond when they rang her doorbell.  Her body was found lying on top of the bed.  The bed did not have any pillows, blankets, sheets or comforters on it.  The apartment was well-kept, and there were no obvious signs that a struggle or an altercation had taken place.

During his investigation of Skinner's death, Honolulu

Police Department (HPD) Detective Kenneth Ikehara (Detective Ikehara) canvassed the Makua Aliʻi building for witnesses and interviewed several of Skinner's neighbors. Pursuant to these efforts, on July 26, 1989, Detective Ikehara spoke to Wanous and took her recorded statement. Wanous's mother lived in the unit next to Skinner's, and Wanous was visiting on the date of the incident.

In her recorded statement, Wanous stated that she woke up at approximately 4:50 a.m. or 5:00 a.m. on the morning of July 25, 1989 to smoke a cigarette at a chair and table located "right outside [her] mother's apartment door." Wanous related that she was "leaning forward" and smoking the cigarette when she heard the sound of "something dropping." Upon hearing the noise, Wanous looked to the right and saw a black[2] male carrying two stuffed pillow cases leave Skinner's apartment. Wanous averred that she saw the man near the door to Skinner's apartment for about three to five seconds before he turned and walked into the elevator.

Wanous stated that when she observed the man, the corridor lights were on, but it was still dark out and there was no sunlight. Wanous noted that although she "seen the [man's] arms was black," she "couldn't make out" the man's face "because

_____

[2]     Austin is a Caucasian male.

4

it was just one color all the way." She also stated that when the man briefly turned towards her, she could see "the whites of his eyes" but "couldn't see anything else." When asked by Detective Ikehara if Wanous could tell what the suspect's race was, Wanous responded that the suspect was "black," but further related an unknown individual had "corrected" her to say "negro." Upon being asked about the suspect's "complexion," Wanous rejected the idea that the suspect was "black, black" and instead described that the suspect was "dark." Wanous opined that she was not sure if she would be able to recognize the man if she saw him again.

Wanous also discussed a few sketches of the suspect she had drawn on a paper bag, which she had given to Detective Ikehara. She stated that a "feeling" helped guide her as she sketched:

> [Wanous:] So I was told this is wrong.
> [Detective Ikehara:] Who, what do you mean? This looks wrong, just tell me.
> [Wanous:] It's a feeling that come to me.
> [Detective Ikehara:] Feeling that came to you, okay. So this drawing is what, of the guy that you saw?
> [Wanous:] I think I saw.
> [Detective Ikehara:] Okay.
> [Wanous:] Something kept telling me, sketch it, sketch it, sketch it, you know, I'm not a very good artist, but this, sketch it, sketch it, (inaudible) sketch it.

Detective Ikehara then attempted to clarify what Wanous meant:

> [Detective Ikehara:] Well, and that just, you just decided something was telling you to do, draw this?
> [Wanous:] Yeah, you know, did that.
> [Detective Ikehara:] Okay.
> [Wanous:] Help my hand and sort of did that, guided

```
                    like.
                    [Detective Ikehara:]  And that's on the second
                    drawing?
                    [Wanous:]  Yes.
```

Also on July 26, 1989, Wanous met with police sketch artist Joe Aragon (Aragon) to prepare a composite drawing of the suspect before Detective Ikehara took her recorded statement. When Detective Ikehara asked Wanous if she could state that the suspect looked like the composite drawing she helped create, she said "[n]o." She only confirmed that the sketch matched her descriptions of the suspect's hair, eyes, and facial shape.

On July 26, 1989, Detective Ikehara obtained a written statement from Wanous's sister, Orchid Ah Loy (Ah Loy), in which she stated that Wanous's other sister, Yvonne Clason (Clason), had told her (Ah Loy) that Wanous had told Clason that she saw a black male exit Apartment 706 "on either Monday, 7-24-89, or Tuesday, 7-25-89, at about 0530 hours," and that the man "was carrying a pillow case." The next day, Detective Ikehara took the recorded statement of Karen Evenson (Evenson), Wanous's niece, wherein she stated that Wanous "told her that a black male carrying pillow cases had exited unit #706 at about 0530 hours, Tuesday, 7-25-89."

On July 26, 1989, Dr. Kanthi De Alwis (Dr. De Alwis) performed an autopsy on Skinner's body. Dr. De Alwis determined that the cause of death was asphyxia due to manual strangulation.

Dr. De Alwis further testified that she recovered a "black or darker-colored" pubic hair that stood out amongst Skinner's light-colored hair, which she preserved as evidence. Dr. De Alwis also took samples of fluid found in the decedent's vagina, the testing of which revealed the presence of recently deposited semen.

On August 3, 1989, Detective Ikehara submitted a draft of a crime information bulletin. The composite drawing that Wanous and Aragon had created was not submitted with the crime information bulletin based upon Aragon's opinion that the drawing did not reflect an accurate description of the suspect, as Wanous was not able to sufficiently describe enough elements of the suspect's facial features. Copies of the crime information bulletin were subsequently printed and distributed.

On September 21, 1989, Allyson Simmons (Simmons), an examiner in the Hair and Fibers Unit in the Fedural Bureau of Investigation laboratory located in Washington D.C., received a parcel containing the dark-colored pubic hairs that Dr. De Alwis had collected from Skinner's body. Then, on January 26, 1990, Simmons received another parcel containing samples of Skinner's pubic hairs. Simmons testified that following a microscopic examination of the darker-colored hairs, she determined that the hairs were "brown Caucasian pubic hairs that were suitable for comparison purposes." Further, Simmons attested that a

microscopic comparison of the "brown Caucasian pubic hairs" with samples of Skinner's pubic hairs revealed that the "brown Caucasian pubic hairs" were "dissimilar" to Skinner's pubic hairs.

In October 1991, Wanous passed away.

Additional testing conducted in 2005 on the fluid samples collected from Skinner's body revealed that the samples contained a mixed DNA profile with two contributors: Skinner and an unknown male. The unknown DNA profile was uploaded to the Hawaiʻi State DNA database on February 10, 2006. On June 2, 2011, the database reported a match between the unknown DNA profile and Austin's DNA profile. On January 18, 2012, the police collected DNA evidence from Austin via buccal swabs pursuant to a search warrant. Testing of the swabs conducted the next day confirmed that the unknown DNA profile in the fluid samples from Skinner's body matched Austin's DNA profile.

On January 20, 2012, police detectives took Austin's recorded statement. Therein, he stated: (1) he was familiar with the 1541 Kalākaua Avenue address because his grandmother used to live there and he had visited her two to three times a month over six to seven years; (2) he remembered that his grandmother lived on the sixteenth floor; (3) upon being shown Skinner's photograph, he did not recognize her; (4) he did not recognize the name "Edith Skinner"; (5) he had never been inside

8

Skinner's apartment; (6) he never had sexual relations with Skinner or with anyone else inside the Makua Aliʻi building; and (7) he did not injure Skinner, cause her death, or take any items from her residence.  He also stated that he did not recall where he was on July 25, 1989.

## A.    Circuit Court Proceedings

On January 25, 2012, Austin was indicted by a grand jury for murder in the second degree.

On July 23, 2013, Austin filed a motion to dismiss for pre-indictment delay.  He argued that the twenty-two year delay between the date of the alleged offense and the date of the indictment prejudiced him due to the loss of an exculpatory witness, Wanous, who was no longer available to testify because she was deceased.  He asserted that "Wanous's testimony would have provided actual exculpatory evidence for Defendant" because she would have testified that she "observed a black male exit [Skinner's] apartment at about 0500 hours on July 25, 1989, carrying two pillow cases" and that "Wanous was able to describe the black male's physical features with great specificity:  19-25 years old, 5'8", slim build, short kinky dark colored hair, dark eyes, dark complexion; no glasses and not [sic] facial hair."

The State countered that Wanous's statement was not a strong source of exculpatory evidence.  The State pointed out that Wanous observed the suspect at 5:00 a.m. when "the sun had

not yet risen and it was dark" and that at the time, she was smoking a cigarette and "was not focused on Unit 706 and only caught a fleeting look at the man." The State also observed that Wanous "provided nothing more than a generalized suspect description" and that "[w]hen she spoke with Detective Ikehara . . . she handed him a sketch of two figures on a paper bag. These sketches, she claimed, were prompted by a 'feeling' she had to draw." The State emphasized that the sketches were fairly unsophisticated and devoid of facial features. At a hearing on the motion held on August 6, 2013, a transcript of Wanous's recorded statement and copies of her sketches were entered into evidence.

On December 4, 2013, the circuit court[3] issued its findings of fact, conclusions of law, and order denying Austin's motion to dismiss for pre-indictment delay. The circuit court found, inter alia: (1) during Wanous's recorded statement, she "said that she was unsure whether she would be able to recognize the man if she saw him again"; (2) the sketch artist with whom Wanous met "advised Detective Ikehara that the drawing [that resulted from their discussion] may not reflect an accurate description because Ms. Wanous could not describe enough of the suspect's facial features" such that "Detective Ikehara did not

---

[3]    The Honorable Colette Y. Garibaldi presided.

include the drawing in the HPD crime information bulletin"; (3) Wanous gave Detective Ikehara two hand-drawn sketches, the first of which had no eyes, nose, or mouth and the second of which "provided slightly more detail but there was nothing to suggest that the figure was a black male"; (4) Wanous told Detective Ikehara that "a 'feeling' prompted her to sketch the figures"; and (5) Wanous could not identify the suspect in several photographic line-ups which were generated based on her general descriptions. Based on these findings, the circuit court ruled that Wanous's death "does not prejudice Defendant" because:

> Ms. Wanous' account that she saw a black male leaving Ms. Skinner's apartment the morning of July 25, 1989, is of speculative value. Ms. Wanous' account does not preclude the possibility that Defendant entered Ms. Skinner's apartment and killed her. Consequently, Ms. Wanous' account is too speculative to demonstrate that its loss impairs Defendant's ability to present an effective defense.

On December 13, 2013, the State filed a motion in limine to exclude Wanous's statements as hearsay. Specifically, the State sought to exclude: (1) Wanous's recorded statement taken by Detective Ikehara; (2) the sketches that she drew; (3) the composite drawing prepared by the police graphic artist; (4) the oral statements she made to Evenson; and (5) any statement she made to Clason and Ah Loy. Austin countered that Wanous's statements were admissible under Hawaiʻi Rules of Evidence (HRE) Rules 804(b)(5) and 804(b)(8), and under Chambers v. Mississippi, 410 U.S. 284 (1973). At the hearing on the motion, held on

11

December 19, 2013, Austin asked the circuit court to "take judicial notice of the records and files in this case" and asserted that under Chambers, Austin had the constitutional right "to a fair opportunity to defend the accusation against him" and that "the statement by Miss Wanous is essential to [Austin's] defense . . . that another person could have committed or had committed this offense."

Also on December 13, 2013, Austin filed a motion in limine seeking to preclude the State and its witnesses from referring to Skinner as "the victim" at trial. At the hearing held on December 19, 2013, Austin argued that "to label the decedent as a victim . . . is more prejudicial than probative."

The circuit court ruled on both parties' motions on January 17, 2014. The circuit court granted the State's motion to exclude Wanous's statements, concluding that the statements did not fit within either HRE Rule 804(b)(5) or HRE Rule 804(b)(8), and that the statements were not admissible under Chambers. The circuit court denied Austin's motion to prevent the State and its witnesses from referring to Skinner as "the victim," relying on State v. Mateo, No. 30371, 2011 WL 5031546 (App. Oct. 21, 2011) (SDO).

Austin was fifty-four years old at trial in 2014; he would have been twenty-nine years old in 1989. Austin testified

12

that in 1989, he had met an older woman at the Makua Aliʻi building, whose name he could not remember, on two occasions. The first time he met this older woman, he spoke with her in the elevator. The second time, he encountered the woman in the lobby where the two engaged in conversation. He testified that after they chatted in the lobby, the older woman invited him to her apartment, where the two continued to talk, and eventually, had consensual sex. He testified that he was in the older woman's apartment for at most an hour, and that after engaging in sexual intercourse with her, he left and went to his grandmother's apartment.

Austin also testified that he did not tell the police about his sexual encounter with the woman in his 2012 interview because he did not recognize the woman in the picture that the police had shown him. Austin attested that he "didn't make the connection between that woman [he had consensual sex with] and the woman that was found murdered."

Following the presentation of evidence, the circuit court instructed the jury on the elements of murder in the second degree, having previously rejected Austin's request for instruction on the lesser included offenses of reckless manslaughter and assault. Both sides then presented their closing arguments.

During the State's closing argument, the prosecutor argued as one of his six points of summation that "[t]he defendant is not worthy of your belief." While making his argument, the prosecutor made the following comments:

(1) He argued that Austin "flat out lied to [the police] with denials of things that couldn't possibly be true" in his recorded interview. After playing a clip of the interview recording, the prosecutor argued: "Come on. The detectives asked him point blank [if he remembered meeting Skinner, speaking with her, or being in her presence] and he denied it. These denials are clear evidence that he lied to the police then. Why would he lie about something so obvious to the police?"

(2) After playing a clip of the interview recording where Austin denied recognizing Skinner's picture or name, the prosecutor commented: "That's obviously a lie. Perhaps he didn't know her name. But if he didn't know her name . . . how is it that he engages in a consensual sexual encounter with a woman whose name is suddenly unknown to him? He's lying to the police repeatedly."

(3) He argued:

> He lied to the police two years ago, but he's persisted in these lies when he spoke to you yesterday. How do you know that?
> You know, this trial is taking place in the City and County of Honolulu on the Island of Oahu. But surely the defendant must be a permanent resident of Fantasy Island because the story he told you yesterday

14

> -- half truths, fabrication, lies, convenient selected memory, and flat-out amnesia. Think about what he told you yesterday.
>
> He said that he recalled having two conversations with an unknown woman in the lobby of the Makua Alii building. Conveniently he never mentioned those conversations to the police. You can listen to his statement.
>
> Why is it that now he has this explanation? Because the defendant has to come up with an explanation for you as to why his semen is inside the victim. He's already lied to the police. He's gotta come up with an explanation as to why his semen is there.

In summarizing the State's case, the prosecutor stated: "Let's put this together. He had the opportunity; he has no alibi; he is left handed;[4] the DNA evidence is conclusive; he lied to the police; and he lied to you." The prosecutor also presented the jury with a narrative summarizing and describing how the murder occurred. In short, he argued that Skinner forgot to lock her front door, that Austin went to her unit after entering the building, and that Austin then strangled and had sex with her.

Additionally, during their respective closing arguments, the parties differed in their views of Skinner's personality. The prosecutor contended that "[d]uring the last

---

[4] During the State's closing argument, the prosecutor argued that Skinner's murderer was left-handed based on Dr. De Alwis' testimony that during the autopsy, she saw multiple contusions on the right side of the neck, diffuse hemorrhaging in the tissues on the right side of the neck, and broken bones on the left side of the throat. The prosecutor argued that such observations supported that Skinner's assailant was facing Skinner at the time he killed her, and had used his left hand to squeeze Skinner's throat as he strangled her. Thus, because Austin had testified that he was left-handed, the prosecutor argued that the evidence further supported that Austin was the culprit.

year of her life, Edith Skinner, then 81, lived a life of quiet solitude." Defense counsel challenged the State's representation of Skinner, arguing: "The State chose to depict Edith Skinner as a frail, reserved, forgetful woman. That's how they want you to see her. Why? Because it's consistent with how they're thinking. . . . It's consistent with the idea that, hey, how can you have [Austin's] DNA on her unless it's by force?" Defense counsel argued that Skinner actually "had a very active social life," emphasizing that "she went swimming every week at the Elk's Club in Waikiki." In rebuttal, the prosecutor questioned defense counsel's assertion that Skinner had an active social life, remarking that no witness had testified that Skinner swam at the Elk's Club weekly.

Defense counsel did not object during the State's closing or rebuttal argument. But, at the end of the proceedings, after the jury had been excused, defense counsel objected to "the State's repeated characterization that Mr. Austin had lied."

On February 5, 2014, the jury found Austin guilty as charged and found that Austin knew or reasonably should have known that Skinner was sixty years of age or older when he caused her death. On February 18, 2014, Austin filed a motion for a new trial, asserting that the prosecutor engaged in misconduct in

closing argument when he: (1) argued that Austin lied in his statements to the police and in his testimony before the jury because such statements expressed "his personal opinion regarding Defendant's credibility"; and (2) told a "story" of how the murder was committed because such argument "was not based on the evidence presented."

Following a hearing on the motion, the circuit court issued its written findings of fact, conclusions of law, and order denying Austin's motion for a new trial on May 8, 2014. The circuit court ruled that it was not improper for the prosecutor to argue that Austin's testimony was unworthy of belief and that he had lied to the police and jury. The circuit court also determined that the State's narrative was supported by the evidence adduced at trial and reasonable inferences drawn therefrom.

On June 18, 2014, Austin was sentenced to an extended sentence of life imprisonment without the possibility of parole pursuant to HRS §§ 706-661 and 706-662(5). He appealed his conviction and sentence to the Intermediate Court of Appeals (ICA). The case was then transferred to this court.

## II. STANDARDS OF REVIEW

### A. Statutory Interpretation

"We review the circuit court's interpretation of a

17

statute <u>de novo</u>."  <u>State v. Akau</u>, 118 Hawaiʻi 44, 51, 185 P.3d 229, 236 (2008).

## B.    Admissibility of Evidence

"[W]here the admissibility of evidence is determined by application of the hearsay rule, there can be only one correct result, and 'the appropriate standard for appellate review is the right/wrong standard.'"  <u>State v. Moore</u>, 82 Hawaiʻi 202, 217, 921 P.2d 122, 137 (1996) (quoting <u>Kealoha v. Cty. of Hawaii</u>, 74 Haw. 308, 319, 844 P.2d 670, 675 (1993), <u>reconsideration denied</u>, 74 Haw. 650, 847 P.2d 263 (1993)).

## C.    Jury Instructions

"When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading."  <u>State v. Sawyer</u>, 88 Hawaiʻi 325, 330, 966 P.2d 637, 642 (1998) (quoting <u>State v. Arceo</u>, 84 Hawaiʻi 1, 11, 928 P.2d 843, 853 (1996)).

## D.    Prosecutorial Misconduct

"Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of 'whether there is a reasonable possibility that the error complained of might have contributed to the conviction.'"

Sawyer, 88 Hawaiʻi at 329 n.6, 966 P.2d at 641 n.6 (quoting State v. Balisbisana, 83 Hawaiʻi 109, 114, 924 P.2d 1215, 1220 (1996)). "If defense counsel does not object at trial to prosecutorial misconduct, this court may nevertheless recognize such misconduct if plainly erroneous." State v. Wakisaka, 102 Hawaiʻi 504, 513, 78 P.3d 317, 326 (2003). "We may recognize plain error when the error committed affects substantial rights of the defendant." Id. (quoting State v. Cordeiro, 99 Hawaiʻi 390, 405, 56 P.3d 692, 707 (2002)).

## E. Motion for a New Trial

"[T]he granting or denial of a motion for new trial is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion." State v. Hicks, 113 Hawaiʻi 60, 69, 148 P.3d 493, 502 (2006) (alteration in original) (quoting State v. Yamada, 108 Hawaiʻi 474, 478, 122 P.3d 254, 258 (2005)). "It is well-established that an abuse of discretion occurs if the trial court has 'clearly exceed[ed] the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.'" Id. (alteration in original) (quoting Yamada, 108 Hawaiʻi at 478, 122 P.3d at 258).

## III. DISCUSSION

Austin asserts the following points of error on appeal:

19

(1) "Under State v. Mundon, The Trial Court Abused its Discretion in Allowing the State and its Witnesses to Refer to Skinner as the 'Victim' or 'Murder Victim' at Trial," (2) "The Trial Court Erred in Excluding Wanous' Statements on Hearsay Grounds and Thereby Denied Austin His Right to a Fair Trial in Accord with Due Process," (3) "The Trial Court Erred by Refusing to Instruct the Jury on Included Offenses," (4) "Because Repeated Misconduct by the DPA During Closing Argument Deprived Austin of a Fair Trial, the Trial Court Erred in Denying his Motion for a New Trial," and (5) "The Trial Court Plainly Erred in Sentencing Austin to an Extended Term in Violation of the Ex Post Facto Clause of the Federal Constitution and HRS § 1-3." We consider each point of error in turn below.

**A.  The circuit court did not abuse its discretion in allowing the State and its witnesses to refer to Skinner as the "victim" at trial.**

According to Austin, the circuit court erred in allowing the State and its witnesses to refer to Skinner as the "victim" or "murder victim" at trial. Austin asserts that the circuit court erred by relying on State v. Nomura, 79 Hawaiʻi 413, 903 P.2d 718 (App. 1995), cert. denied, 80 Hawaiʻi 187, 907 P.2d 773 (1995), and State v. Mateo, No. 30371, 2011 WL 5031546 (App. Oct. 21, 2011) (SDO), rather than on State v. Mundon, 129 Hawaiʻi 1, 292 P.3d 205 (2012), which is controlling. Austin

20

argues that pursuant to Mundon, the State should not have been permitted to refer to Skinner as the "victim" because the circuit court did not find that there was a good reason to justify the use of the term by the State and its witnesses in this case.

In Nomura, the defendant was charged with physically abusing his wife, the complaining witness. 79 Hawaiʻi at 415, 903 P.2d at 720. The complaining witness and the defendant got into an argument while grocery shopping, which later escalated into a physical fight after they returned to the complaining witness's apartment. Id. The complaining witness testified that during the fight, the defendant grabbed, hit, slapped, and choked her. Id. The defendant testified that the complaining witness had initiated the fight in response to the defendant telling her that he wanted a divorce. Id. The defendant denied grabbing, hitting, slapping, or choking the complaining witness as she had testified. Id. The jury was instructed as follows on the elements of the offense of abuse of a family or household member:

> There are three (3) material elements to this charge, which the prosecution must prove beyond a reasonable doubt. The elements are:
> 1) The defendant physically abused the victim.
> 2) The victim is either a family or household member; and
> 3) The defendant physically abused the victim intentionally, knowingly, or recklessly.

Id.

On appeal, the defendant argued that by referring to the complaining witness as the "victim" in the foregoing jury

instruction, the trial court improperly commented on the evidence in violation of HRE Rule 1102 and thereby prejudiced the defendant. Id. at 416, 903 P.2d at 721. The ICA held:

> Hence, the term "victim" is conclusive in nature and connotes a predetermination that the person referred to had in fact been wronged. Because the question of whether Witness had been abused was a question yet to be decided by the jury, it was improper to refer to her as "the victim." Furthermore, Defendant denied any contact with Witness which might have caused her injury, making the existence of "injury" another question to be decided by the jury. Obviously, the trial court could have used the term "complaining witness" or referred to Witness by her name to avoid any appearance of partiality. . . .
>
> . . . .
>
> Accordingly, we hold that the reference to a complaining witness as "the victim" in criminal jury instructions is inaccurate and misleading where the jury must yet determine from the evidence whether the complaining witness was the object of the offense and whether the complaining witness was acted upon in the manner required under the statute to prove the offense charged. Here, the question of whether Witness was the object of the crime and whether she suffered physical "abuse" were elements required to be proven under the statute and, hence, matters for the jury to evaluate and not for the court to comment upon. Thus, we disapprove of the reference to the complaining witness as a "victim" in Instruction No. 01.

Id. at 416-17, 903 P.2d at 721-22 (emphasis added). However, the ICA ultimately concluded that "[v]iewing the instructions in their entirety, we do not believe the court's reference to Witness as 'the victim' was prejudicial." Id. at 417, 903 P.2d at 722.

In Mundon, the defendant was found guilty of attempted sexual assault, kidnapping, and assault. 129 Hawaiʻi at 9, 292

22

P.3d at 213. The complaining witness testified that the defendant molested her several times while she was sleeping in his car, and that when she had attempted to leave the vehicle, the defendant threatened to cut her with a knife. Id. at 6-7, 292 P.3d at 210-11. The complaining witness attested that she managed to escape when the defendant permitted her to leave the vehicle to relieve herself. Id. at 8, 292 P.3d at 212. The defendant did not testify at trial. Id. at 9, 292 P.3d at 213.

On appeal, this court held that the circuit court erred in allowing the prosecutor to refer to the complaining witness as the "victim" at trial. Id. at 26, 292 P.3d at 230. The Mundon court first noted that, in contrast with Nomura, the term "victim" did not appear in the jury instructions and was not used by the court. Id. However, this court reasoned:

> Nomura also found the jury instruction problematic because the trial court must instruct the jury on the law but may not comment upon the evidence. Nomura explained that such a rule derives from the principle that the trial judge must endeavor at all times to maintain an attitude of fairness and impartiality. The use of the term was also wrong in light of this principle, because the trial court could have used the term "complaining witness" or referred to her by name to avoid the appearance of partiality. The presumption of innocence and the maintenance of fairness and impartiality during the trial are precepts underlying Nomura. Hence, the court erred in allowing Respondent and the witnesses to refer to Complainant as "the victim."
> . . . It would seem, in light of Nomura, that unless there are good reasons found by the court for permitting otherwise, the court should instruct all counsel that they and their witnesses must refrain from using the term.
> Notwithstanding the court's error, the use of the term "victim" in the limited circumstances of this

23

> case was not prejudicial to Petitioner and, hence, does not itself warrant reversal of his convictions. However, it "is incompatible with the presumption of innocence for the prosecution to refer to the complaining witness as the 'victim,' just as it is to refer to the defendant as a 'criminal.'" Thus, on remand, this admonition should be heeded.

Id. (emphases added) (citations omitted).

Nomura and Mundon are distinguishable from the present case and do not apply here. In both Nomura and Mundon, both complaining witnesses testified at trial and claimed that they were victims of the defendants' crimes. Therefore, in those cases, references to the complaining witnesses as "victims" connoted a predetermination that the witnesses had been wronged and that the crimes occurred as the witnesses had testified, and consequently, unfairly implied the defendants' guilt. By contrast, here, Skinner did not testify at trial or accuse Austin of any crime. Additionally, Austin did not dispute that Skinner was murdered; his defense at trial was that he was not the individual who had caused her death. Because there was no dispute as to whether Skinner had been the object of a crime, and the key issue at trial was the identity of the perpetrator, the State's use of the term "victim" did not connote Austin's guilt. Thus, the circuit court did not err in permitting the State or its witnesses from referring to Skinner as "the victim" at

24

trial.[5]

## B.   The circuit court did not err in excluding Wanous's statements as hearsay.

### 1.   HRE Rule 804(b)(5)

#### a.   Ah Loy's, Evenson's, and Clason's Statements Recounting Wanous's Statements

Austin advances two arguments in support of his position that Wanous's statements, as introduced through Ah Loy, Evenson, and Clason, were admissible.  First, Austin contends that the circuit court erred in excluding Ah Loy's written statement to the police.  For the first time on appeal, Austin appears to argue that the circuit court should have analyzed the statement as consisting of several layers of hearsay within hearsay:  (1) Wanous's statement to Clason; (2) Clason's statement to Ah Loy; and (3) Ah Loy's written statement to Detective Ikehara.  Austin contends that each layer of hearsay falls within HRE Rule 804(b)(5), such that Ah Loy's written statement, with Wanous's statement therein, was admissible.

Second, Austin argues that Wanous's statements to Evenson and Clason (who relayed Wanous's statement to Ah Loy) fell within HRE Rule 804(b)(5).  Accordingly, Austin asserts that

---

[5]    Although we hold that, on the facts in this case, the circuit court did not err in permitting the State to refer to Skinner as the "victim" because the parties did not dispute that she had been murdered, our holding does not preclude courts faced with similar circumstances in the future from providing for the use of a term such as "deceased" in lieu of the word "victim."

had Evenson or Clason been permitted to testify directly as to what Wanous had told them, Wanous's statements could have been properly admitted into evidence.

Assuming arguendo that Clason and Evenson were available to testify directly to Wanous's statements, we conclude that Wanous's statements were not admissible as statements of recent perception under HRE Rule 804(b)(5).

HRE Rule 804(b)(5) (1985) provides:

> (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> (5) Statement of recent perception. A statement, not in response to the instigation of a person engaged in investigating, litigating, or settling a claim, which narrates, describes, or explains an event or condition recently perceived by the declarant, made in good faith, not in contemplation of pending or anticipated litigation in which the declarant was interested, and while the declarant's recollection was clear[.]

HRE Rule 804(b)(5) is a codification of our decision in Hew v. Aruda, 51 Haw. 451, 462 P.2d 476 (1969). HRE Rule 804(b)(5) cmt. (1985) (stating that HRE Rule 804(b)(5) "restates the holding of Hew v. Aruda"). Our analysis of whether Wanous's statements were admissible under HRE Rule 804(b)(5) begins with an examination of our holding in Hew.

At issue in Hew was the existence of a contract. 51 Haw. at 453, 462 P.2d at 478. The plaintiff alleged that the

26

defendant, a partnership, entered into an oral agreement to rent his interest in a piece of land and sought payment of a balance owed. Id. The plaintiff presented several pieces of documentary evidence supporting the rental agreement's existence. Id.

The defendant could not rebut the plaintiff's evidence because the partner who allegedly entered into the contract on behalf of the partnership had died. Id. The defendant attempted to admit the deceased partner's out-of-court statement that the partnership had no outstanding bills relevant to the disputed rental agreement. Id. at 454, 462 P.2d at 478-79. The trial court excluded the statement as hearsay. Id. at 454, 462 P.2d at 479.

Analyzing whether the trial court erred in excluding the statement of the deceased partner, this court stated:

> The shortcomings of the [general hearsay] rule barring statements of decedents are obvious. Relevant and competent evidence, otherwise admissible, is excluded even when it is the only available evidence. This forces the finder of fact to decide a case with a minimum of information concerning the facts in issue. We think this is an unsound approach to the pursuit of truth in an adversary context.
> Since the decedent is obviously unavailable, there is great need for this particular testimony to be introduced into evidence. No alternative means of introducing the evidence exists. While the great vice of hearsay statements is the potential lack of trustworthiness, this single liability is not enough to justify the exclusion of a decedent's statement when accuracy can be shown in other ways. By focusing the inquiry on the circumstances surrounding the declarant's position when he made the statement, a determination of trustworthiness can be made by the trial judge. Certain safeguards must be met in order to guarantee that trustworthiness, however. We hold that a statements [sic] is not excluded by the hearsay

27

> rule if the declarant is unavailable as a witness and the court finds that the statement was made in good faith, upon the personal knowledge of the declarant, and while his recollection was clear, <u>unless other circumstances were present indicating a clear lack of trustworthiness</u>.  This very reasonable limitation of trustworthiness is necessary since the party against whom the statement is offered has no opportunity to test the hearsay by cross-examination.

<u>Id.</u> at 456-57, 462 P.2d at 480 (emphases added).  In a footnote, the <u>Hew</u> court commented that "[a] clear lack of trustworthiness might be shown by a statement made 'in response to the instigation of a person engaged in investigating, litigating, or settling a claim, or 'in contemplation of pending or anticipated litigation in which he (the declarant) was interested.'"  <u>Id.</u> at 457 n.1, 462 P.2d at 480 n.1 (quoting the Preliminary Draft of the Proposed Rules of Evidence for the United States District Courts and Magistrates, Rule 804(b)(2) and Advisory Committee's Note at 210-11 (March 1969)).

Pursuant to the foregoing, inasmuch as HRE Rule 804(b)(5) is a codification of this court's holding in <u>Hew</u>, it appears that HRE Rule 804(b)(5) permits the admissibility of a hearsay statement by an unavailable witness in limited instances where the circumstances surrounding the statement, such as those contemplated by the <u>Hew</u> court, sufficiently guaranteed its trustworthiness.  <u>Id.</u> at 457, 462 P.2d at 480; HRE Rule 804(b)(5) cmt. (1985).  However, the <u>Hew</u> court unambiguously stated that even if its contemplated safeguards for trustworthiness were

28

present, such hearsay statements ought to be excluded if "other circumstances were present indicating a clear lack of trustworthiness." Id.; see also State v. Haili, 103 Hawaiʻi 89, 100, 79 P.3d 1263, 1274 (2003) ("[T]his court will review the circuit court's determination of trustworthiness under HRE Rules 804(b)(5) and 804(b)(8) for an abuse of discretion.").

Applying the aforementioned principles from Hew to the present case, we believe that Wanous's statements were not admissible under HRE Rule 804(b)(5). Indeed, Wanous's statements were accompanied by several of the circumstantial guarantees of trustworthiness contemplated in Hew, and codified in HRE Rule 804(b)(5). Wanous spontaneously told Ah Loy, Clason, and Evenson that she had seen a black male leaving Skinner's apartment on the day that Skinner's body was discovered. As such, Wanous's statements to her sisters and niece were not made "at the instigation of a person investigating . . . a claim." Wanous "explain[ed] an event . . . recently perceived," and it does not appear that Wanous made the statements in bad faith. The record also does not indicate that Wanous made the statement "in contemplation of pending or anticipated litigation in which [she] was interested." Lastly, Wanous made the statements "while [her] recollection was clear," insofar as she spoke with Ah Loy, Clason and Evenson a few hours after observing the black male leave

29

Skinner's apartment.

However, Wanous's statements were also surrounded by circumstances abundantly indicating their <u>lack</u> of trustworthiness. In particular, the record supports that: (1) Wanous only saw the suspect for "maybe three to five seconds"; (2) Wanous observed the suspect at around 5:00 a.m. while it was still dark outside--there was no sunlight, and the only lights on at the time were the corridor lights; (3) Wanous was not in an optimal position to get a clear glance at the suspect insofar as she was initially "leaning over" and occupied with smoking a cigarette before she made her observation; (4) Wanous stated that although she "seen the arms was black," she "couldn't make out" the suspect's face "because it was just one color all the way"; (5) Wanous's only glimpse of the suspect's facial features was "real fast" from a side-view as the suspect turned around; (6) Wanous said that when the suspect briefly turned towards her, she could see "the whites of his eyes" but "couldn't see anything else"; (7) Wanous stated that the suspect "looked a male" based upon her observation that the suspect "didn't have bosom," rather than upon her observation of the suspect's face; (8) upon being asked if she could identify the suspect's race, Wanous initially stated that the suspect was "black," but later related that an unknown individual had "corrected" her to say "negro"; (9) when

asked to describe the suspect's complexion, Wanous rejected the idea that the suspect was "black, black," and instead described that he was "dark"; (10) Wanous commented on "how far away" the suspect was from her when she saw him; (11) Wanous decided to sketch the suspect based upon a "feeling" which "guided" her hand; (12) Wanous could not say that the suspect looked like the person depicted in the composite sketch that she had helped to create; (13) Detective Ikehara did not attach the composite sketch to the crime information bulletin because Wanous was not able to adequately describe enough of the suspect's facial features, such that Aragon believed that the drawing did not reflect an accurate description of the suspect; and (14) Wanous could not confirm that she would be able to identify the suspect if she saw him again.

Accordingly, excluding Wanous's statements to her sisters and niece, which are surrounded by ample facts that strongly indicate their lack of trustworthiness, was consistent with our holding in Hew--the case which HRE Rule 804(b)(5) codifies. Therefore, we hold that based on the facts of this case, the circuit court did not abuse its discretion in ruling that Wanous's statements to Ah Loy, Evenson, and Clason were not admissible under HRE Rule 804(b)(5).

### b. Wanous's Statements to Detective Ikehara

Austin also asserts that the circuit court erred in ruling that Wanous's statements to the police were not admissible under HRE Rule 804(b)(5). He asserts that "[b]ecause a criminal prosecution is not a 'claim,' a police officer investigating a crime is not 'engaged in investigating, litigating, or settling a claim'" within the meaning of the Rule.

Although Austin's argument raises an interesting question as to whether statements procured by police officers during official criminal investigations are statements that are made "in response to the instigation of a person engaged in investigating . . . a claim" within the meaning of HRE Rule 804(b)(5), we need not resolve this issue to address Austin's arguments on this point. Pursuant to our analysis in section III.B.1.a, supra, we hold that the circuit court did not abuse its discretion in ruling that Wanous's statements to Detective Ikehara were not admissible under HRE Rule 804(b)(5), because her statements were accompanied by a multitude of circumstances that indicate their lack of trustworthiness.

### 2. HRE Rule 804(b)(8)

Austin maintains that even if Wanous's statements were not admissible under HRE Rule 804(b)(5), they were admissible under HRE Rule 804(b)(8). He argues that the circuit court erred

by failing to consider numerous facts that supported Wanous's trustworthiness, including: (1) Wanous made several consistent statements to "trusted confidantes" within a short period of time; (2) several facts in Wanous's statements were corroborated by other evidence; (3) the evidence neither demonstrated that Wanous lacked capacity nor illustrated that Wanous was an untruthful person; and (4) Wanous was a disinterested party.

Though currently codified as HRE Rule 804(b)(8), the catch-all exception was initially codified as HRE Rule 804(b)(6) at the time the offense occurred in this case. The text of the exception, however, remains unchanged and states, in part:

> (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> (8) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (B) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

HRE Rule 804(b)(8) (2016).

Although hearsay rulings are generally reviewed under the right/wrong standard, this court has held that a trial court's determination of whether a statement is trustworthy is reviewed for an abuse of discretion. Haili, 103 Hawaiʻi at 103,

33

79 P.3d at 1277. "The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." State v. Plichta, 116 Hawaiʻi 200, 214, 172 P.3d 512, 526 (2007) (quoting State v. Ganal, 81 Hawaiʻi 358, 373, 917 P.2d 370, 385 (1996)).

In State v. Swier, the defendant was charged with negligent homicide in the second degree as a result of his involvement in a car accident. 66 Haw. 448, 666 P.2d 169 (1983). The State sought to introduce a statement made by a witness to a police officer two days after the accident. Id. at 448-49, 666 P.2d at 169-70. Though the witness apparently left Hawaiʻi after the accident, he initially stated that he would return and testify, but later refused to do so. Id. at 449, 666 P.2d at 170. Because the case was a misdemeanor case, the State was unable to compel the witness to return to Hawaiʻi. Id. The circuit court excluded the statement, and on appeal, the State argued that the statement should have been admitted under the catch-all exception, then codified as HRE Rule 804(b)(6). Id. at 449-50, 666 P.2d at 170. This court held:

> The problem with the State's contention is that the trial court was not satisfied that [the witness's] statement had circumstantial guarantees of trustworthiness equivalent to those which have long been recognized in the case of the exceptions set forth in Rules 804(b)(1) through (5).
> In ruling on the motion, the trial court

34

> correctly pointed out that [the witness's]
> demonstrated equivocation with respect to returning to
> Hawaii to testify cast some doubt on the
> trustworthiness of his statement.  We cannot say that
> the trial court abused its discretion in rejecting the
> statement.  We therefore affirm the trial court's
> ruling excluding [the witness's] statement without
> reaching the constitutional issue of the right to
> confrontation.

Id. at 450, 666 P.2d at 170.

Similar to Swier, the circuit court here was not satisfied that Wanous's statements had sufficient circumstantial guarantees of trustworthiness.  The circuit court reasoned:

> The language of 804(b)(8) indicates that, in order to
> qualify for this hearsay exception, as a threshold
> matter, the hearsay statement must be trustworthy.
> Here, there are no "circumstantial guarantees of
> trustworthiness" surrounding Anne Wanous' statements.
> . . . All of the circumstances tied to Anne Wanous'
> statements indicate its lack of trustworthiness--
> specifically that she was unable to provide the sketch
> artist with a description that was worthy even of the
> crime bulletin, and that her own sketch was devoid of
> any detail and was the product of what Anne Wanous
> described as a "feeling" that compelled her to draw
> the sketch.  Because Anne Wanous' statements lack the
> circumstantial guarantees of trustworthiness that HRE
> Rule 804(b)(8) requires, the statements do not qualify
> for the 804(b)(8) exception to the hearsay rule.

Though the circuit court's analysis regarding the trustworthiness of Wanous's statements was brief, this may be because the circuit court had previously considered, at length, the trustworthiness of Wanous's statements when it evaluated Austin's motion to dismiss for pre-indictment delay.  In ruling on the State's motion in limine, the circuit court, at Austin's request, took judicial notice of all of the documents in the case record, which included its own ruling on Austin's motion to

35

dismiss for pre-indictment delay.  Therein, the circuit court found the following facts, which have independent support in the record and indicate that Wanous's statements lacked trustworthiness:  (1) Wanous was unable to confirm that she would be able to identify the suspect if she saw him again; (2) Wanous was prompted to draw the sketches of the suspect based on a "feeling" which "guided" her hand; (3) the sketches had very little detail--one sketch had no eyes, nose, or mouth, and the other did not contain anything to suggest that the figure was a black male; (4) Aragon advised Detective Ikehara that the composite drawing might not have reflected an accurate description of the suspect because Wanous could not describe enough of the suspect's facial features, such that Detective Ikehara did not include the drawing in the HPD crime information bulletin; and (5) Wanous could not identify the suspect in several photographic line-ups that were generated based on her general descriptions of the suspect.

Furthermore, the circuit court's ruling that Wanous's statements were not trustworthy is supported by the additional facts concerning the circumstances in which Wanous observed the suspect, as discussed in section III.A.1.a, supra.

Despite Austin's contention that there were some facts supporting that Wanous's statements were trustworthy, ample facts

also indicated that her statements were not trustworthy. We therefore conclude that the circuit court did not clearly exceed the bounds of reason or disregard rules or principles of law or practice in ruling that Wanous's statements lacked sufficient circumstantial guarantees of trustworthiness to warrant their admission under HRE Rule 804(b)(8).

### 3. **Chambers v. Mississippi**

Austin argues that even if Wanous's statements were not admissible under HRE Rule 804, they were admissible under Chambers v. Mississippi because "[t]here was a great need" for the evidence, as Wanous's statements were "the only independent evidence that Austin could offer to corroborate his testimony that someone else had caused Skinner's death."

In Chambers, the defendant was charged with murdering a police officer by shooting the officer during a fight involving a large crowd at a bar. 410 U.S. at 285-87. A man named Gable McDonald (McDonald) subsequently confessed that he, not the defendant, shot and killed the officer. Id. at 287. However, McDonald later repudiated his sworn confession and testified at a preliminary hearing that he had been persuaded by a third party to confess to the murder. Id. at 288. He attested that the third party had promised him a share of the proceeds from a lawsuit that the defendant would bring against the town. Id.

37

McDonald's repudiation was accepted and his involvement was not investigated further.  Id. at 288.

At trial, the defendant called McDonald as a witness. Id. at 291.  McDonald testified that he did not shoot the officer and that he had only confessed on the promise of receiving a share of the sizable tort recovery from the town.  Id.  When the defendant tried to introduce the testimony of three witnesses to whom McDonald had admitted that he had shot the officer, the State raised an objection based on hearsay, which the trial court sustained.  Id. at 292.  On certiorari to the United States Supreme Court, the defendant argued that his constitutional right to due process was violated because, inter alia, he could not introduce the testimony of the witnesses to whom McDonald had confessed.  Id. at 294.  The Court held:

> The hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability.  First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred.  Second, each one was corroborated by some other evidence in the case--McDonald's sworn confession, the testimony of an eyewitness to the shooting, the testimony that McDonald was seen with a gun immediately after the shooting, and proof of his prior ownership of a .22-caliber revolver and subsequent purchase of a new weapon.  The sheer number of independent confessions provided additional corroboration for each.  Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sense self-incriminatory and unquestionably against interest. . . . Finally, if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and was under oath.  He could have been cross-examined by the State, and his

38

> demeanor and responses weighed by the jury. . . .
> . . . <u>The testimony rejected by the trial court
> here bore persuasive assurances of trustworthiness and
> thus was well within the basic rationale of the
> exception for declarations against interest.  That
> testimony also was critical to Chambers' defense</u>.  In
> these circumstances, where constitutional rights
> directly affecting the ascertainment of guilt are
> implicated, the hearsay rule may not be applied
> mechanistically to defeat the ends of justice.

<u>Id.</u> at 300-02 (emphases added) (footnote and citations omitted).

In short, in <u>Chambers</u>, the United States Supreme Court established a two-part test that applies to determine whether a hearsay statement may be admissible pursuant to a defendant's constitutional right to due process.  <u>See</u> <u>id.</u> at 302.  Under the Court's analytical framework in <u>Chambers</u>, the defendant must establish that:  (1) the statement is "critical to [his or her] defense" and (2) that the statement "bore persuasive assurances of trustworthiness."  <u>Id.</u>  In this case, the parties do not dispute that Wanous's statements were critical to Austin's defense.  Rather, the key issue is whether Austin satisfied the second part of the <u>Chambers</u> test by establishing that Wanous's statements "bore persuasive assurances of trustworthiness."

Austin notes that there are some similarities between the facts in <u>Chambers</u> and the facts in the present case, which arguably support the trustworthiness of Wanous's statements. Here, as in <u>Chambers</u>, Wanous spontaneously spoke to two family members with whom she was closely acquainted later in the morning after she observed the black male leave Skinner's apartment.

39

And, like in <u>Chambers</u>, Wanous's observations were corroborated by some independent evidence--her observation that the black male was carrying stuffed pillow cases is consistent with several witnesses' testimony that the bed upon which Skinner's body had been found did not have any blankets, sheets, comforters, or pillows.

However, despite having some similarities with <u>Chambers</u>, this case is distinguishable in that numerous facts indicate that Wanous's statements were substantially less trustworthy compared to McDonald's in <u>Chambers</u>. Though Wanous's statements to Evenson and Clason may have been spontaneous, her recorded statement to Detective Ikehara was not. Significantly, several key statements in Wanous's recorded interview, in which she described the suspect's features, were not spontaneous to the extent that Detective Ikehara appeared to lead or suggest her responses. For example, Detective Ikehara appeared to lead Wanous into describing the suspect as a black or negro male:

> [Detective Ikehara:] Okay, can you describe this person. Was he a male or female? Was it a, was a male or female?
> [Wanous:] It looked a male because it didn't have bosom, you know.
> [Detective Ikehara:] And what race would you say, this person, this male was?
> [Wanous:] I seen the arms was black, you know, both arms black, and the face, I couldn't make out because it was just one color all the way . . .
> [Detective Ikehara:] Wait, wait, wait, as far as race, could you tell what race he was?
> [Wanous:] By the color of his skin and hair, I, I said it was black and then, and I was corrected like negro.

40

> [Detective Ikehara:]  Okay, so you saw a black or
> negro male . . .
> [Wanous:]  Uh-huh.
>
>           . . . .
>
> [Detective Ikehara:]  What about his complexion, was
> real black, real dark?
> [Wanous:]  Not that black, black type.
> [Detective Ikehara:]  So, but he was dark?
> [Wanous:]  Dark, yes.

(Third ellipses added.)  Likewise, Detective Ikehara seemed to
lead Wanous into describing the suspect's hair as dark, kinky,
and short:

> [Detective Ikehara:]  Okay, and then, ah, what color
> was his hair?
> [Wanous:]  It wasn't, it wasn't blonde or red or what
> . . .
> [Detective Ikehara:]  So it's dark hair?
> [Wanous:]  Dark hair.
> [Detective Ikehara:]  And what style was it, do you
> know?
> [Wanous:]  Was close, close . . .
> [Detective Ikehara:]  Close to the head?
> [Wanous:]  Yeah, close.
> [Detective Ikehara:]  Was it curly or straight or
> . . .
> [Wanous:] Well, it looked, ah, no, no, not straight,
> ah . . .
> [Detective Ikehara:]  Kinky?
> [Wanous:]  Kink . . .
> [Detective Ikehara:]  Is that right?
> [Wanous:]  To the hair, to the, to the scalp.
> [Detective Ikehara:]  Kinky kind of hair?
> [Wanous:]  Well, that's all I could see when he
> turned.
> [Detective Ikehara:]  Kinky, but is that right?
> [Wanous:]  Not that springy type.
> [Detective Ikehara:]  Uh-huh, curly?
> [Wanous:]  (inaudible).
> [Detective Ikehara:]  Kinky or curly or how would you
> describe it?
> [Wanous:]  Curly would be a little wider, yeah?
> [Detective Ikehara:]  Uh-huh.
> [Wanous:]  Kinky would be small, yeah.
> [Detective Ikehara:]  What?
> [Wanous:]  Yeah, small.
> [Detective Ikehara:]  Kinky? Okay, uhm, so it was
> short then the hair, yeah?
> [Wanous:]  Yes, it wasn't ah, ah, ah, wild type
> hairdo.

> [Detective Ikehara:] How was the hair styled? All
> you can say it was close to the head?
> [Wanous:] Yeah, that's all.
> [Detective Ikehara:] And how long was it, real short?
> [Wanous:] It wasn't long.

Thus, unlike McDonald's statements, which were completely made at his own behest, 410 U.S. at 300, several of the crucial portions of Wanous's recorded statement appeared to be in response to Detective Ikehara's leading questions. Her statements, therefore, were less trustworthy compared to McDonald's in Chambers.

Similarly, while Wanous's statements were corroborated by some other evidence, the amount of corroborating evidence and the extent of validation were significantly less compared to Chambers. Here, at most, one or two facts from Wanous's statements, which were irrelevant to her description of the suspect, were corroborated by the testimony of a few other witnesses. By contrast, in Chambers, McDonald's statements were corroborated not only by numerous witnesses' statements, but also substantial physical evidence. 410 U.S at 300. And, unlike McDonald's statements, Wanous's statements were not self-incriminatory. Cf. id. at 300-301. These facts indicate that Wanous's statements were more untrustworthy than McDonald's in Chambers.

Lastly, unlike McDonald, Wanous was unavailable to testify at trial because she was deceased. Cf. 410 U.S. at 301.

The State had no means of addressing any questions concerning the truthfulness of Wanous's statements because she could not "have been cross-examined by the State, and [her] demeanor and responses weighed by the jury." Id. Put differently, a safeguard against unreliability which was present in Chambers is absent here, thus rendering the cases distinguishable from one another. Christian v. Frank, 595 F.3d 1076, 1085 (9th Cir. 2010) ("Moreover, Chambers can be further distinguished from the case before us in that, here, . . . [the declarant] was declared to be unavailable. His unavailability contrasts sharply with the availability of McDonald in Chambers, which the Supreme Court of the United States stressed greatly enhanced the reliability of the extrajudicial statements in that case." (citation omitted)).

The present case can be additionally distinguished from Chambers inasmuch as Wanous's statements not only lacked several of the assurances of trustworthiness that bolstered McDonald's statements in Chambers, but her statements were also accompanied by numerous indicia of untrustworthiness that were not present in Chambers, as discussed in section III.B.1.a, supra.

In order for Wanous's statements to have been admissible under Chambers, Austin was required to demonstrate that Wanous's testimony was "critical to [his] defense" and that the statements "bore persuasive assurances of trustworthiness."

43

Chambers, 410 U.S. at 302. Based on the foregoing, we hold that the circuit court did not abuse its discretion in ruling that the second requirement was not met, and determining that Wanous's statements were not admissible under Chambers.

To conclude, the circuit court did not abuse its discretion in ruling that Wanous's statements were not admissible under HRE Rule 804(b)(5), HRE Rule 804(b)(8), or Chambers.

## C. The circuit court did not err by refusing Austin's proposed jury instructions for lesser included offenses.

Austin asserts that the circuit court erred in failing to instruct the jury on the lesser included offenses of manslaughter and assault. Austin contends that at trial, "[t]here was evidence of the cause of Skinner's death and that Austin had engaged in intercourse with her, but there was no evidence of forced entry or that Skinner's apartment had been ransacked or disturbed in any way." Thus, Austin argues that a rational juror could have concluded that Austin did not intentionally or knowingly cause Skinner's death, and instead could have found that he had acted recklessly in killing or injuring Skinner.

"[J]ury instructions on lesser-included offenses must be given where there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." State v.

44

Flores, 131 Hawai'i 43, 51, 314 P.3d 120, 128 (2013). "The failure to instruct the jury on a lesser included offense for which the evidence provides a rational basis warrants vacation of the defendant's conviction." Id. at 58, 314 P.3d at 135.

The parties in the present case do not dispute that manslaughter and assault in the first, second, and third degrees are lesser included offenses of the charged offense, murder in the second degree. The issue is whether there was a rational basis in the evidence for the jury to acquit Austin of the offense charged and instead convict him of any of the lesser included offenses. See Flores, 131 Hawai'i at 51, 314 P.3d at 121.

Under HRS § 707-702(1)(a) (1985), "(1) A person commits the offense of manslaughter if: (a) He recklessly causes the death of another person[.]" A person commits assault in the first degree if he or she "intentionally or knowingly causes serious bodily injury to another person." HRS § 707-710 (1985). A person commits assault in the second degree if he or she "intentionally or knowingly causes substantial bodily injury to another" or "recklessly causes serious bodily injury to another person." HRS § 707-711 (Supp. 1988). Assault in the third degree requires that a person "[i]ntentionally, knowingly, or recklessly cause[] bodily injury to another person" or

45

"[n]egligently cause[] bodily injury to another person with a dangerous instrument."  HRS § 707-712 (1985).

Under the State's theory of the case, Skinner was murdered based on the fact that the cause of death was asphyxia due to manual strangulation--a conscious and deliberate act reflecting the intent to cause the death of another person.  The State introduced evidence supporting that Austin was Skinner's murderer, which included:  (1) Austin's testimony that he had access to the Makua Aliʻi building because his grandmother lived there at the time and he visited her regularly; (2) testimony that Austin's DNA was detected in the sample of the fluid found in Skinner's body at the time of her death; and (3) testimony that Austin could not be excluded as a donor of a dark-colored pubic hair that was found amongst Skinner's light-colored pubic hair.

Austin's defense was that while he may have had sexual intercourse with Skinner before she was murdered, he was not the individual who killed her.  At trial, Austin testified that he and Skinner engaged in consensual sexual relations after he had spoken with her on two occasions.  However, Austin unequivocally attested that he was not the individual who strangled Skinner, nor was he the person who caused her death.  In other words, Austin acknowledged that Skinner had been strangled, but

46

maintained that someone else was responsible.

The evidence adduced at trial does not provide a rational basis for a verdict acquitting Austin of murder in the second degree and instead finding him guilty of either manslaughter or any degree of assault. Austin correctly notes that the State's evidence supported that: (1) based upon Dr. De Alwis' autopsy report, the cause of Skinner's death was manual strangulation, and (2) there was no evidence of forced entry, a struggle, or that Skinner's apartment had been disturbed or ransacked in any way. Such facts, however, do not support that Skinner's assailant acted recklessly rather than intentionally or knowingly when he or she strangled Skinner. Accordingly, these facts do not form a rational basis for acquitting Austin of murder in the second degree, and instead finding him guilty of reckless manslaughter or assault.

Additionally, Austin did not proffer any evidence to support that while he was engaging in sexual intercourse with Skinner, he recklessly caused Skinner's death or otherwise inflicted any sort of bodily injury upon her. In fact, Austin offered little information about his sexual encounter with Skinner, testifying only that it was consensual, that he believed that it occurred in the late afternoon, that he and Skinner spoke for about twenty-five to thirty minutes in her apartment before

47

they had sex, that they had intercourse on her bed, that she was wearing a dress, that he was in her apartment for at most an hour, and that he immediately went to his grandmother's apartment afterwards.

Accordingly, the record does not contain any evidence to support that Skinner's strangulation was the product of reckless rather than intentional behavior.  It follows that, based on the evidence presented at trial, the jury could have rationally arrived at one of two conclusions:  (1) Austin was the individual who deliberately strangled Skinner, and consequently was guilty of murder in the second degree, or (2) Austin did not strangle Skinner and did not cause her death, and should have been acquitted.  There was no rational basis for acquitting Austin of murder in the second degree and instead finding him guilty of manslaughter or assault.  We therefore hold that the circuit court did not err in refusing to instruct the jury on the foregoing lesser included offenses.

## D. The circuit court did not err in denying Austin's motion for a new trial on the basis of prosecutorial misconduct.

"Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial."  State v. Clark, 83 Hawaiʻi 289, 304, 926 P.2d 194, 209 (1996) (quoting State v. McGriff, 76 Hawaiʻi 148, 158, 871

48

P.2d 782, 792 (1994)).  When determining whether the alleged prosecutorial misconduct rises to the level of reversible error, this court considers three factors:  (1) the nature of the alleged misconduct; (2) the promptness or lack of a curative instruction; and (3) the strength or weakness of the evidence against the defendant.  Id.

Austin argues that the circuit court erred in denying his motion for a new trial because the prosecutor engaged in several acts of prosecutorial misconduct, which deprived Austin of his right to a fair trial.  He alleges five arguments regarding misconduct.  We address each in turn.

### 1.  Shifting the Burden of Proof

Austin argues that during the State's closing argument, the prosecutor made three arguments that improperly shifted the burden of proof to him.  First, Austin argues that the prosecutor "incorrectly and improperly suggested to the jury that Austin bore the burden of disproving his identity as the perpetrator of the charged offense" when he stated:

> The defendant does not have an alibi for the time of the murder. In an alibi case, the person asserting the alibi concedes that the underlying crime has occurred but challenges the identity of the perpetrator, claiming that at the time the offense was allegedly committed he was somewhere else.  The defendant has no alibi.

Second, Austin argues that the prosecutor implied that "it was Austin's burden to refute the State's DNA evidence," when

49

he made the following comments:  (1) "The DNA evidence in this case demonstrates beyond any reasonable doubt that the defendant and no one else, is directly responsible for Edith's death"; (2) "What is the only reasonable inference that you can draw if a medical examiner finds the defendant's pubic hair mixed within the murder victim's?"; (3) "The defendant's unique genetic fingerprint was found inside of the murder victim"; and (4) "The defendant's unique genetic fingerprint was found inside of Edith Skinner."

Finally, Austin argues that the prosecutor improperly "suggested to the jury that Austin's account should not be believed because he failed to present independent evidence to corroborate it."  On this point, Austin points to the prosecutor's comment that "[t]he defendant's version of events to you is nothing more than the uncorroborated delusions of a desperate man," and that the jury must consider "the extent to which his account is corroborated or uncorroborated or contradicted by the other credible evidence."

Austin did not object to any of the foregoing comments at trial.  When defense counsel fails to object to prosecutorial misconduct at trial, we may still recognize such misconduct if it affected the defendant's substantial rights, such that the circuit court's failure to take corrective action constituted

plain error.  <u>Wakisaka</u>, 102 Hawaiʻi at 513, 78 P.3d at 326.  The analysis proceeds in two steps.  First, we determine whether the prosecutor's actions constituted misconduct.  <u>Clark</u>, 83 Hawaiʻi at 304, 926 P.2d at 209.  If we conclude that the prosecutor's actions were improper, we analyze whether the action affected the defendant's substantial rights, such that the circuit court plainly erred by not intervening and taking remedial action.  <u>Id.</u>

In criminal trials, "the burden is always upon the prosecution to establish every element of [a] crime by proof beyond a reasonable doubt, never upon the accused to disprove the existence of any necessary element."  <u>State v. Cuevas</u>, 53 Haw. 110, 113, 488 P.2d 322, 324 (1971).  Accordingly, "efforts by the prosecution to shift the burden of proof onto a defendant are improper and implicate the due process clauses of the fourteenth amendment to the United States Constitution and article I, section 5 of the Hawaiʻi Constitution."  <u>State v. Hauge</u>, 103 Hawaiʻi 38, 55-56, 79 P.3d 131, 148-49 (2003).

We agree that the prosecutor's comment concerning Austin's lack of an alibi constituted misconduct insofar as the comment might infer that Austin bore the burden of proving that he had an alibi on the date of Skinner's death.  Likewise, the prosecutor's remark regarding whether Austin's testimony was corroborated by other evidence may also have qualified as

misconduct to the extent that it might infer that Austin had a burden to produce evidence tending to corroborate his testimony.

However, the comments were harmless beyond a reasonable doubt and did not affect Austin's substantial rights. Prior to closing argument, the circuit court instructed the jury that "[t]he defendant has no duty or obligation to call any witnesses or produce any evidence," and that the presumption of innocence "places upon the prosecution the duty of proving every material element of the offense charged against the defendant beyond a reasonable doubt." During his closing argument, defense counsel stated multiple times that the State bore the burden of proving its case beyond a reasonable doubt. For example, defense counsel stated: "Gerald has no burden of proof. He has no duty to present evidence. He has no duty to present witnesses. . . . And he has no burden at all to prove his innocence." Further, during the State's rebuttal closing argument, the prosecutor asserted that "the prosecution has the burden of proof. And it's a burden that I glad ly [sic] bear."

Based on the foregoing, and in light of the totality of the evidentiary record, we do not believe that the prosecutor's fleeting comments in closing argument concerning Austin's lack of an alibi and uncorroborated testimony affected his substantial rights, as the comments were harmless beyond a reasonable doubt.

Consequently, the circuit court did not plainly err by failing to intervene and address the comments during the State's closing and rebuttal closing argument.

With respect to Austin's second burden-shifting argument, we hold that the State's remarks on the DNA evidence were not improper. Fairly read, the prosecutor did not insinuate or otherwise imply that Austin bore the burden of refuting the State's DNA evidence. Rather, in making the disputed comments, the prosecutor simply restated the evidence presented at trial-- that Austin's DNA had been found in the fluid samples recovered from Skinner's body and that the darker-colored pubic hair found on Skinner could have been Austin's--and appropriately commented on the legitimate inferences that such evidence supported--that Austin was the individual who brought about Skinner's death. Such comments fell within the wide latitude that prosecutors have in discussing the state of the evidence, and the reasonable inferences that can be drawn therefrom, during closing argument. Clark, 83 Hawaiʻi at 304, 926 P.2d at 209. Consequently, the prosecutor's remarks concerning the DNA evidence did not constitute misconduct.

We conclude that although two of the prosecutor's comments may have improperly inferred that Austin bore the burden of proving that he had an alibi and producing evidence to

corroborate his testimony, the comments were harmless beyond a reasonable doubt and did not affect Austin's substantial rights. Thus, the circuit court did not plainly err by not interceding and taking corrective action. We further conclude that the prosecutor's comments regarding the State's DNA evidence did not constitute misconduct.

### 2. Misstating the Elements of the Offense

Austin argues that his conviction should be overturned because the prosecutor "completely misstated the second element of Murder in the Second Degree[6] and the State's burden with regard to HRS § 706-660.2[7]" when he stated:

> But the prosecution is only required to prove what the law says. And based on the instructions that rest on

---

[6]    HRS § 707-701.5(1) (Supp. 1988) provides:  "(1) Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

[7]    HRS § 706-660.2 (Supp. 1988) provides, in relevant part:

> Notwithstanding section 706-669, a person who, in the course of committing or attempting to commit a felony, causes the death or inflicts serious or substantial bodily injury upon a person who is:
>
> (1) Sixty years of age or older;
>
> . . . .
>
> and such disability is known or reasonably should be known to the defendant, shall, if not subjected to an extended term of imprisonment pursuant to section 706-662, be sentenced to a mandatory minimum term of imprisonment without possibility of parole as follows:
>
> (1) For murder in the second degree--up to fifteen years.

> your lap, there are only three things.
>      Has the evidence demonstrated that on the date
> prescribed, that the defendant intentionally or
> knowingly engaged in certain conduct?  2) As a result
> of that conduct, did he cause Ms. Skinner's death?
> And 3) Once you've concluded that, has the evidence
> demonstrated that Ms. Skinner was 60 years or older?
> That's all that the prosecution has placed upon it as
> its burden.

Austin asserts that the prosecutor relieved the State of its

obligation to prove Austin's state of mind with regard to causing

Skinner's death, and relieved the State of its burden of proving

Austin's state of mind as to Skinner's age.  As Austin did not

object to the comment at trial, we must again consider whether

the prosecutor's comment constituted misconduct and, if so, where

the circuit court plainly erred in declining to take corrective

action.  Clark, 83 Hawaiʻi at 304, 926 P.2d at 209.

Arguments of counsel which misstate the law are subject

to objection and to correction by the court.  State v. Mahoe, 89

Hawaiʻi 284, 290, 972 P.2d 287, 293 (1998).  However, improper

comments by a prosecutor can be cured by the court's instructions

to the jury, and it will be presumed that the jury adhered to the

court's instructions.  State v. Kupihea, 80 Hawaiʻi 307, 317-18,

909 P.2d 1122, 1132-33 (1996).

In State v. Klinge, the defendant was convicted of

terroristic threatening in the first degree for having placed

objects resembling bombs near several religious institutions.  92

Hawaiʻi 577, 580-83, 994 P.2d 509, 512-15 (2000).  On appeal, the

defendant argued that the prosecutor misstated the elements of terroristic threatening in the first degree when he stated that the jury could find the defendant guilty if the jury determined that the defendant "scared a lot of people . . . [or] caused evacuation of one or more building[s]. . . . " Id. at 596, 994 P.2d at 528 (alterations in original).

This court observed that "it is clear that the prosecutor misstated the law" when he made the foregoing comment. Id. However, the Klinge court held:

> Nonetheless, we believe the instructions of the court in its charge to the jury, both before and after the presentation of evidence, remedied any potential harm to Klinge. Throughout the trial, the court made it clear to the jury that it was to apply the law as it was given to them by the court. Thus, in view of the court's proper instructions on terroristic threatening, Klinge fails to show that the prosecution's momentary misstatement of law amounts to reversible error.

Id. (emphasis added).

The facts in Klinge parallel the facts in this case. Here, the prosecutor misstated the law when he omitted that the State was required to prove that the defendant "intentionally or knowingly caused the death of another person" when commenting on the elements of murder in the second degree. See HRS § 707-701.5. The prosecutor also misstated the law when he left out the fact that the State had to prove that Austin knew or reasonably should have known that Skinner was over the age of sixty. See HRS § 706-660.2.

56

However, as in <u>Klinge</u>, the prosecutor's misstatements here did not substantially prejudice Austin's right to a fair trial.  Prior to the parties' closing arguments, the circuit court correctly instructed the jury on the elements of murder in the second degree and the requirements of HRS § 706-660.2; the jury members already had these correct instructions before them as the parties delivered their closing arguments.  The circuit court also instructed that "[i]n the event that a statement or argument made by a lawyer contradicts or misstates these instructions, you must disregard that statement or argument and follow these instructions," and that "[s]tatements or remarks made by counsel are not evidence."  Further, during the State's closing argument, the prosecutor correctly reiterated the elements of murder in the second degree and properly articulated the State's burden under HRS § 706-660.2.  Defense counsel also correctly restated the elements of murder in the second degree during his closing argument.

In view of the circuit court's correct instructions, both parties' otherwise accurate recitations of the law throughout their closing arguments, and the evidentiary record as a whole, we hold that the prosecutor's momentary misstatements of the law did not affect Austin's substantial rights, as they were harmless beyond a reasonable doubt.  Accordingly, the circuit

57

court did not plainly err by not stepping in and taking corrective action.

3.      **Assertions that Austin "Lied" to the Police and Jury**.

Austin makes four arguments in support of his contention that the circuit court erred in denying his motion for a new trial based on the prosecutor's comments that Austin "lied" to the jury at trial and "lied" to the police in his recorded interview.  We address each argument in turn.

First, Austin argues that while this court "has not yet held that it is absolutely improper for a prosecuting attorney to refer to the defendant [as] a 'liar'[8] or say that he 'lied,'" he "urge[s] this court to adopt a rule that blanket assertions that a defendant has lied or is a liar constitute prosecutorial misconduct and that where the defendant's credibility is a key issue in determining his guilt such misconduct demands that the defendant receive a new trial."

Austin correctly observes that this court has not previously prohibited prosecutors from arguing in their closing arguments that the defendant "lied."  However, we believe that his proposed rule should not be adopted because it is at odds

---

8      During closing argument, the prosecutor did state that Austin "lied" and that several of Austin's statements in his recorded police interview and direct examination were "lies," but he did not at any point call Austin a "liar."

with our precedent addressing the boundaries of a prosecutor's ability to, during closing argument, comment on the state of the evidence and draw inferences regarding the defendant's credibility when the defendant testifies as a witness at trial.

In State v. Clark, the defendant was charged with attempted second-degree murder for allegedly stabbing his wife in the chest after an argument. 83 Hawaiʻi at 291-93, 926 P.2d at 196-98. At trial, conflicting evidence was presented to the jury regarding the defendant's drug usage prior to the incident. Id. at 305, 926 P.2d at 210. While the complaining witness testified that she and the defendant had ingested cocaine, the defendant denied taking any drugs and testified that he was familiar with drugs, that he knew where to purchase them, that he was with his wife the previous evening when she purchased and used cocaine, and that he attempted to purchase more cocaine for her. Id. Based on this conflicting evidence, the prosecutor argued, "[w]hen the defendant comes in here and tells you that he was not on cocaine that night, that just--it's a cockamamie story and it's asking you to take yourselves as fools." Id. at 304, 926 P.2d at 209 (alteration in original) (footnote omitted). On appeal, the defendant argued that the comment constituted prosecutorial misconduct. Id.

The Clark court first observed that "[i]t is generally

recognized under Hawaiʻi case law that prosecutors are bound to refrain from expressing their personal views as to a defendant's guilt or the credibility of witnesses."  Id.  However, this court noted that "a prosecutor, during closing argument, is permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence."  Id.  This court further acknowledged that "[i]t is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence."  Id.  Recognizing that other courts have upheld similar remarks in closing argument, the Clark court held:

> Based upon the [conflicting] evidence in the present case and the context in which the phrase "cockamamie story" was utilized . . . the prosecutor was well within the limits of propriety to infer, and indeed argue, that Clark's denial of drug usage was improbable, untruthful, and, in short, a "cockamamie story."  Accordingly . . . there was no misconduct on the part of the prosecutor in this case.

Id. at 306, 926 P.2d at 211.

Since Clark, this court has upheld the following comments made by a prosecutor during closing argument concerning the defendant's credibility (or lack thereof) as a witness:  (1) argument that the defendant, as well as some of his witnesses, had testified falsely, but that the State's witnesses had not, Cordeiro, 99 Hawaiʻi at 425-26, 56 P.3d at 727-28; (2) argument that the "evidence adduced at trial did not comport with defense counsel's assertions during opening statements," State v.

Valdivia, 95 Hawaiʻi 465, 482-83, 24 P.3d 661, 678-79 (2001); and (3) argument that the defendant's testimony was disingenuous because he failed to "explain away" how his DNA was found at the crime scene. Hauge, 103 Hawaiʻi at 54-57, 79 P.3d at 147-50.

In sum, we have held that it is not improper for prosecutors to assert that a defendant's testimony is not credible in a variety of ways so long as such an inference is reasonably supported by the evidence. This court has even permitted the use of a brusque colloquialism as a means of arguing that the defendant is not credible as a witness. See Clark, 83 Hawaiʻi at 306, 926 P.2d at 211. Thus, while we do not condone or encourage the use of terse idioms or, as was the case here, repeated assertions that the defendant "lied" as a preferred means of questioning the credibility of a defendant's testimony, we believe that such remarks do not amount to misconduct when they are supported by the evidence adduced at trial. Our position on this point is consistent with appellate courts in other jurisdictions across the nation, which have also determined that it is not improper for a prosecutor to assert during closing argument that the defendant "lied" when such assertions are supported by the evidence that was presented trial. See e.g., People v. Edelbacher, 766 P.2d 1, 30 (Cal. 1989) (in bank) ("Referring to the testimony and out-of-court

61

statements of a defendant as 'lies' is an acceptable practice so long as the prosecutor argues inferences based on evidence rather than the prosecutor's personal belief resulting from personal experience or from evidence outside the record."); State v. McKenzie, 134 P.3d 221, 229 (Wash. 2006) (en banc) ("Where a prosecutor shows that other evidence contradicts a defendant's testimony, the prosecutor may argue that the defendant is lying."); Commonwealth v. Coren, 774 N.E.2d 623, 631 n.9 (Mass. 2002) ("[W]here the evidence clearly supports the inference that the defendant lied, the prosecutor may fairly comment on it."); Hull v. State, 687 So.2d 708, 721 (Miss. 1996) ("It is not improper for a prosecutor to comment that the defendant was lying when the contention is supported in the record.").[9]

---

[9]    See also, State v. Lankford, 399 P.3d 804, 827-28 (Idaho 2017) (holding that "although the repeated use of the term 'liar' and its various grammatical forms is troubling and ill-advised, it did not rise to the level of prosecutorial misconduct" because "the prosecutor supported his assertions with evidence presented during the trial"); Davis v. State, 698 So.2d 1182, 1190 (Fla. 1997) (concluding that the prosecutor's references to the defendant's tape-recorded confessions as "bald-faced lies" during closing argument "did not cross the line into improper argument" because "[w]hen it is understood from the context of the argument that the charge is made with reference to the evidence, the prosecutor is merely submitting to the jury a conclusion that he or she is arguing can be drawn from the evidence"); Cooper v. State, 854 N.E.2d 831, 835-37 (Ind. 2006) (determining that the prosecutor's references to the defendant's testimony as "lies" and characterization of the defendant as a "liar" was not improper because the evidence at trial supported the inference that the defendant did not tell the truth when he testified before the jury); People v. Mastowski, 155 A.D.3d 1624, 1625 (N.Y. App. Div. 2017) (determining that the prosecutor's argument that the "defendant 'lie[d] to the police about his alcohol consumption' prior to operating his motor vehicle . . . was fair comment on the evidence" (brackets in original)); United States v. Sullivan, 522 F.3d 967, 982 (9th Cir. 2008) (concluding that the prosecutor's assertions that the defendant "lied or misled the bankruptcy court" and "[told] lies to bankruptcy counsel" during closing argument did not constitute misconduct because "they were a
(continued...)

Second, Austin asserts that the prosecutor engaged in misconduct by expressing his personal opinion regarding Austin's credibility by repeatedly stating that Austin had lied. This argument is also without merit.

In Cordeiro, the defendant was convicted of murder in the second degree, robbery in the first degree, and two firearms-related offenses. 99 Hawaiʻi at 397, 56 P.3d at 699. On appeal, the defendant argued that the prosecutor engaged in misconduct when during closing argument, the prosecutor suggested that certain witnesses, including the defendant, were lying, while others were being truthful. Id. at 425, 56 P.3d at 727.

---

[9](...continued)
fair inference" from facts supported by evidence at trial (brackets in original)); State v. Gonzales, 884 N.W.2d 102, 118-19 (Neb. 2016) (declining to adopt a per se rule that a prosecutor engages in misconduct by arguing that the defendant "lied," and concluding that, based upon the context in which it was made, the prosecutor's statement that the defendant lied in that case did not constitute misconduct because the remark "was nothing more than commentary on what the prosecutor believed the evidence showed"); Commonwealth v. Sanchez, 82 A.3d 943, 981-82 (Pa. 2013) (concluding that the prosecutor did not engage in misconduct in remarking that the defendant had lied during his trial testimony because such argument was a proper response to defense counsel's arguments regarding the credibility of other witnesses, and because the prosecutor did not characterize his attack on the defendant's credibility as reflecting his own opinion); Duke v. State, 99 P.3d 928, 956-59 (Wyo. 2004) (holding that the prosecutors' repeated assertions to the jury that the defendant had lied did not constitute misconduct because "the prosecutors were merely pointing out that the evidence and the testimony of the prosecution's witnesses contradicted that of [the defendant] and express[ed] the prosecutions' position upon inferences to be drawn from that testimony and the other evidence presented at trial"); Rogers v. State, 280 P.3d 582, 589 (Alaska Ct. App. 2012) ("It is not plain error for the prosecutor to assert that the defendant is a liar when that argument is based on the evidence."); People v. Starks, 451 N.E.2d 1298, 1305 (Ill. App. Ct. 1983) ("It is not improper comment to call the defendant or a witness a 'liar' if conflicts in evidence make such an assertion a fair inference."); State v. Pedro S., 865 A.2d 1177, 1187-88 (Conn. App. Ct. 2005) (holding that although unprofessional, prosecutor's repeated assertions that the defendant had "lied" and that the defendant was a "liar" did not constitute misconduct because the argument was supported by the evidence at trial).

This court acknowledged that "prosecutors are bound to refrain from expressing <u>their personal views</u> as to a defendant's guilt or the credibility of witnesses." <u>Id.</u> at 424-25, 56 P.3d at 726-27. But, this court noted that "Cordeiro has failed, however, to cite any example . . . of the DPA expressing his <u>personal</u> views regarding Cordeiro's guilt or a witness' credibility. Nor can we find any." <u>Id.</u> at 425, 56 P.3d at 727. The <u>Cordeiro</u> court concluded that the prosecutor appropriately argued that the defendant and his alibi witnesses were untruthful "based on the conflicting evidence presented at trial" and that such argument was "permissible under our holding in <u>Clark</u>." <u>Id.</u>

As in <u>Cordeiro</u>, Austin has failed to cite any language indicating that the prosecutor was expressing his personal opinion as to Austin's credibility during the State's closing and rebuttal arguments. The prosecutor's argument that Austin was an untrustworthy witness because he had "lied" was properly based on conflicting evidence presented at trial. Austin's statements in his recorded interview, in which he unequivocally denied having sexual intercourse with Skinner or any other individual in the Makua Aliʻi building, directly conflicted with his testimony at trial, in which he stated that he had consensual sex with an elderly resident at the Makua Aliʻi building. Therefore, because the prosecutor's comments reflected the reasonable inference that

Austin was not truthful in his 2012 recorded statement, his testimony before the jury, or both, we hold that the comments were not improper.[10]

Third, relying upon State v. Basham, 132 Hawaiʻi 97, 319 P.3d 1105 (2014), Austin appears to argue that the prosecutor committed misconduct by introducing the fact that Austin lied to the police for the first time during closing argument. Austin seems to contend that pursuant to Basham, such a comment must be

_____

[10] Relying upon State v. Marsh, 68 Haw. 659, 728 P.2d 1301 (1986), the Dissent contends that the prosecutor improperly expressed his opinion regarding Austin's credibility during closing argument by repeatedly contending that Austin lied. Dissent at 13-14. The Dissent observes that the prosecutor in Marsh similarly argued that the defendant lied during her testimony, and concludes that Marsh supports that the prosecutor in this case committed misconduct for making comparable comments. Dissent at 13-14.

Indeed, in Marsh, the prosecutor made the following statement during closing argument regarding the defendant's testimony: "Use your common sense, ladies and gentlemen. That is not true. It's another lie. It's a lie, ladies and gentlemen, an out-and-out lie." 68 Haw. at 660, 728 P.2d at 1302. However, the Marsh court's analysis did not turn on this comment alone. See id. at 660-61, 728 P.2d at 1302-03. This court observed that the prosecutor made numerous comments during closing argument which explicitly expressed her personal opinion that the defense witnesses did not testify truthfully. Id. at 660, 728 P.2d at 1302. For example, in commenting on the testimony of one of the defense's witnesses, the prosecutor stated: "You should entirely disregard their testimony because, if you will remember, every one of them lied on the stand. . . . I sincerely doubt if she [witness] had seen Christina Marsh there." Id. (alterations in original) (emphasis added). Similarly, in commenting on a witness's testimony, the prosecutor stated: "I find that awfully hard to believe." Id.

Therefore, in Marsh, this court held that the prosecutor's comments were improper because they explicitly referenced her personal opinion that the defense witnesses and the defendant lied in their testimony at trial. Id. at 660-61, 728 P.2d at 1302-03. This court did not determine that the prosecutor's statement that the defendant lied, in and of itself, improperly reflected the prosecutor's personal opinion with respect to the defendant's credibility. See id. Accordingly, Marsh is distinguishable from the present case, and does not support that the prosecutor committed misconduct by expressing his personal opinion regarding Austin's credibility. See Cordeiro, 99 Hawaiʻi at 424, 56 P.3d at 726 (concluding that the prosecutor did not commit misconduct because "Cordeiro has failed, however, to cite any example, as in Marsh, of the DPA expressing his personal views regarding Cordeiros's guilt or a witness' credibility").

considered especially prejudicial to the defendant, and that "[a]ny allegation that Austin lied to the police should have been weighed under HRE Rules 401, 402, 403, and 404." As Austin did not raise this argument before the circuit court, we must again review for plain error. Clark, 83 Hawai'i at 304, 926 P.2d at 209.

In Basham, the defendant and his son were convicted of assault in the first degree as accomplices in connection with an altercation that arose out of a car accident. 132 Hawai'i at 100-03, 106, 319 P.3d at 1108-11, 1114. The defendant and his son had allegedly aided another person, referred to as "Driver," who had punched the complaining witness in the face. Id. at 101-02, 319 P.3d at 1109-10. While discussing the defendant's role in the altercation during closing argument, the prosecutor argued, for the first time, that the defendant "lied to the police" because the officer who was initially dispatched to the scene identified the defendant as the driver of one of the cars involved in the accident, and that only the defendant could have been the source of such information. Id. at 105, 319 P.3d at 1113. On appeal, the defendant contended that the prosecutor engaged in misconduct by arguing that the defendant lied to the police. Id. at 108, 319 P.3d at 1116. The ICA affirmed the defendant's conviction. Id.

On certiorari, this court first acknowledged that the defendant did not testify at trial and that the record was unclear as to what the defendant had said to the police officer. Id. at 113, 319 P.3d at 1121. This court further noted that because lying to the police "is generally perceived by the public as particularly wrongful and may have also constituted the crime of false reporting to law-enforcement authorities," any evidence that the defendant had lied to the police would have been subject to HRE Rule 404(b)[11] as evidence of "other acts," in addition to being subject to balancing under HRE Rule 403.[12] Id. at 113-14, 319 P.3d at 1121-22. Thus, because the prosecutor referenced the defendant's lie for the first time during closing argument, this court held:

---

[11] HRE Rule 404(b) (1985) provides, in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.

[12] HRE Rule 403 (1985) provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

> Basham had no opportunity to rebut the allegation with
> evidence.  It is apparent that the prosecutor is not
> permitted to bypass the evidentiary rules in this
> manner by asking the jury to infer conduct which, if
> it had been introduced during the trial, would have
> been subject to the limitations of Rule 404(b).

Id. at 114, 319 P.3d at 1122.

The facts of the present case are significantly distinguishable from those in Basham.  In Basham, this court held that the prosecutor had engaged in improper argument because in remarking that the defendant had lied to the police for the first time during closing argument, the prosecutor introduced a new substantive fact that may have been inadmissible at trial and for which no evidence had been introduced.  132 Hawaiʻi at 113-15, 319 P.3d at 1113.  By contrast, here, the prosecutor's comment that the defendant had lied to the police was directed towards attacking Austin's credibility as a witness and was based on evidence properly admitted at trial.  Therefore, Basham is inapposite to the present case, and Austin's argument based thereupon is without merit.

Finally, Austin argues that the prosecutor engaged in misconduct when he stated:  "We're not here simply because his genetic fingerprint is in the murder victim.  We're also here because when confronted and given an opportunity to explain himself, he lied to the police.  And he's lied to you."  To Austin, the comment improperly "implied that Austin would not have been arrested or charged if he told the truth to the police"

68

and "[misled] the jury about the evidence, injected issues broader than Austin's guilt or innocence into the jury's deliberation of the case, and was a total misrepresentation of the underlying facts."

Austin mischaracterizes the prosecutor's statement and ignores the context in which it was made.  Prior to making the contested comment in rebuttal argument, the prosecutor stated:

> The defendant would . . . paint the defendant in a sympathetic light to explain why he was unable to come up with the truth when he spoke with the police. It was 22 years ago, the defense says to you.  Who remembers anything that happened 22 years ago?  The police had what they wanted and they were pressing him.
> The defendant knew why he was [at the police station] and what he was being questioned about. . . . There was no mystery why he was there.  He wasn't tricked.  He wasn't coerced.  Do not feel sorry for him.  He knew why he was there and he opted to speak.
> He told you under cross-examination that there was only one woman in the Makua Alii building with whom he had had intercourse.  That's what he said. How is it when he's being questioned by homicide detectives that he conveniently forgets that one experience and cannot make the connection in his mind that the police are there to question him about that one experience?
> Do not feel sorry for him.  As [defense counsel] said, We're not here to make decisions based on pity, passion, or prejudice.  But the defendant is not deserving of your pity and he is unworthy of your passion.  He knew why he was there, and he straight-up lied to the police.
> <u>We're not here simply because his genetic fingerprint is in the murder victim.  We're also here because when confronted and given an opportunity to explain himself, he lied to the police.  And he's lied to you.</u>

(Emphasis added.)  Viewed in context, it appears that the prosecutor was responding to defense counsel's assertion during Austin's closing argument that Austin did not mention he had

69

sexual intercourse with an elderly woman in the Makua Aliʻi building during his interview with the police because Austin was intimidated and uncertain about the matters he was being asked about.  Such comments fell within the wide latitude that prosecutors have in rebuttal closing to respond to arguments raised by defense counsel in closing argument, and did not constitute misconduct.  State v. Mars, 116 Hawaiʻi 125, 142, 170 P.3d 861, 878 (App. 2007).

To conclude, we believe that it was not improper for the prosecutor to argue that Austin's testimony was unworthy of belief, and that he had lied to the police and to the jury.

### 4.  Use of Disparaging Epithets

Austin argues that the prosecutor attempted to inflame the passions of the jury and distract them from properly considering the evidence when the prosecutor characterized Austin as "a permanent resident of Fantasy Island," and  "a misunderstood Casanova, wooer of women of the Makua Alii building, someone whom Edith Skinner found so -- so appealing, so irresistible that she knowingly invited a stranger to her home on a second-chance encounter and invited him to have sexual intercourse with her . . . he's simply a misguided and misunderstood Casanova."  We review for plain error, as Austin did not object to the comment at trial.  Clark, 83 Hawaiʻi at

304, 926 P.2d at 209.

In State v. Pacheco, the defendant was charged with escape in the second degree when, after being arrested for drinking in a public park, the defendant ran away from the police, leaped over a wall into a stream, and swam therein until the fire department managed to extract him, with some difficulty due to his resistance. 96 Hawaiʻi 83, 87-88, 26 P.3d 572, 576-77 (2001). During the State's rebuttal argument, the prosecutor commented on the defendant's uncooperativeness, arguing: "Everybody that wanted to help him, this defendant spit at, he kicked at. He was totally uncooperative. He was being an asshole. And that explains his actions." Id. at 93, 26 P.3d at 582. This court held that the comment was improper because:

> [T]he DPA's characterization of Pacheco as an "asshole" strongly conveyed his personal opinion and could only have been calculated to inflame the passions of the jurors and to divert them, by injecting an issue wholly unrelated to Pacheco's guilt or innocence into their deliberations, from their duty to decide the case on the evidence.

Id. at 95, 26 P.3d at 584.

Unlike the comments by the prosecutor in Pacheco, the prosecutor's remarks in this case did not convey his personal opinion about Austin's personality or conduct. Here, the prosecutor used colloquialisms to simultaneously describe Austin's testimony, in which Austin stated that he and Skinner had engaged in consensual sexual intercourse after speaking

71

briefly on two occasions, and comment on the implausibility thereof.  These remarks appear to respond to defense counsel's assertions in Austin's closing argument that while the evidence demonstrated that Austin had consensual sex with Skinner, Austin was not responsible for her death.

In short, the prosecutor's comments did not constitute misconduct because they did not "strongly convey[] [the prosecutor's] personal opinion" in an attack on Austin's character or personality, nor were they "calculated to inflame the passions of the jurors and to divert them . . . from their duty to decide the case on the evidence."  Pacheco, 96 Hawaiʻi at 95, 26 P.3d at 584.  The remarks appropriately commented on the evidence and fell within the wide latitude that prosecutors have to respond to comments made by defense counsel in the defense's closing argument.  Clark, 83 Hawaiʻi at 304, 926 P.2d at 209, Mars, 116 Hawaiʻi at 142, 170 P.3d at 878.

     **5.**    **Reliance on Facts Not in Evidence in Delivering the Summary Narrative and Misstating the Evidence**

        **a.**    **The Summary Narrative**

Austin argues that the narrative that the prosecutor presented to the jury during closing argument, in which he summarized and described the State's theory of how Skinner's death occurred, was "merely tangentially related to the evidence that was actually introduced at trial" and was "more akin to the

72

presentation of new evidence to the jury."

Upon review of the record, we conclude that all of the statements that the prosecutor made throughout his summary narrative were permissibly drawn inferences that were reasonably supported by the evidence adduced at trial. We therefore hold that the circuit court did not err in ruling that the prosecutor did not engage in misconduct when he presented the summary narrative during closing argument.

### b. Misstating the Evidence and Misleading the Jury.

Austin did not object to either of the following two instances of alleged misconduct at trial, nor did he raise these arguments in his motion for a new trial. Accordingly, we review for plain error. Clark, 83 Hawaiʻi at 304, 926 P.2d at 209.

Austin contends that the prosecutor misstated the evidence when he "indicated that nobody had testified that Skinner 'went swimming weekly at the Elk's club in Waikiki.'" Austin argues that such comment was false because Stephen Skinner testified that as part of her "daily routine" in 1989, Skinner would "go down quite a bit down to the Elk's Club to swim."

Austin's argument is without merit because the prosecutor's statements accurately commented on the state of the evidence. Clark, 83 Hawaiʻi at 304, 926 P.2d at 209 ("It is also within the bounds of legitimate argument for prosecutors to

73

state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence."). While Stephen Skinner testified that Skinner would "go down quite a bit down to the Elk's Club to swim," no other witness explicitly testified that Skinner went swimming on a "weekly" basis. Thus, the prosecutor did not completely mischaracterize or misstate the evidence and did not engage in misconduct in making the contested comment. We therefore do not reach the issue of plain error.

Finally, Austin argues that "the DPA exerted undue pressure and distracted the jury from its duty of impartiality and due care" when the prosecutor stated: "After you're excused to begin your deliberations, select the foreperson <u>and vote quickly because justice in this case has waited too long</u>."

The prosecutor's comment was improper insofar as the timeliness of a verdict should not be a pertinent consideration on jurors' minds as they deliberate. But, the comment was harmless beyond a reasonable doubt, and did not affect Austin's substantial rights. While the prosecutor did encourage the jury to resolve the case quickly, he did not explicitly invite the jury to disregard their duty to carefully evaluate the evidence, or to base their verdict on anything other than the evidence. Further, shortly before asking the jury to "vote quickly," the prosecutor remarked that "this is in fact a serious case worthy

of your complete attention and thoughtful analysis." And, the record indicates that the jurors engaged in thoughtful deliberations based on the facts and the law, and were not primarily motivated by a desire to resolve the case quickly. For example, on the second day of deliberations, the jurors sent a jury communication that sought "clarification of what second degree murder is."

Thus, we hold that while the prosecutor's comment may have improperly brought the timeliness of reaching a verdict to the jurors' attention, the remark was harmless beyond a reasonable doubt, and did not affect Austin's substantial rights. The circuit court consequently did not plainly err by not interceding and taking corrective action.

## E. Austin's sentence violated Article 1, Section 10 of the United States Constitution and HRS § 1-3.

According to Austin, the circuit court's sentence of life imprisonment without the possibility of parole was an unconstitutional ex post facto application of the law and violated HRS § 1-3, because HRS § 706-661 did not provide for a life sentence without the possibility of parole in 1989, when the offense in this case took place.[13]

---

[13] Austin did not bring this issue to the attention of the circuit court and raises this argument for the first time on appeal. Hawaiʻi Rules of Penal Procedure (HRPP) Rule 52(b) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the

(continued...)

Article I, Section 10 of the United States Constitution provides: "No State shall . . . pass any . . . ex post facto Law." The United States Supreme Court has stated that "[t]he Constitution forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer." Lindsey v. Washington, 301 U.S. 397, 401 (1937). Furthermore, HRS § 1-3 (1985) states: "No law has any retrospective operation, unless otherwise expressed or obviously intended."

Austin was sentenced to an extended term of life imprisonment without the possibility of parole pursuant to HRS §§ 706-661 and 706-662(5) (2014). HRS § 706-661 (2014) states that "[t]he court may sentence a person who satisfies the criteria for any of the categories set forth in section 706-662 to an extended term of imprisonment, which shall have a maximum length as follows: (1) For murder in the second degree--life without the possibility of parole[.]" However, the version of HRS § 706-661 that applied at the time of Skinner's murder did not contain the provision permitting such an extended sentence for those convicted of murder in the second degree. See HRS § 706-661 (1985). That provision was not added to the statute until 1999,

---

[13](...continued)
attention of the court." Here, Austin's extended sentence impacts his constitutional rights. Pursuant to HRPP Rule 52(b), we notice plain error, and consider the arguments he raises in this point of error on the merits.

and the legislature did not express any intent for the amendment to apply retroactively.  <u>See</u> HRS § 706-661 (1999).

Therefore, we hold that Austin's extended sentence constitutes the application of a new punitive measure to a crime that was already consummated in violation of Article I, Section 10 of the United States Constitution and HRS § 1-3.  Accordingly, we vacate Austin's sentence and remand the case for resentencing in accordance with HRS § 706-661 (1985).

### IV.  CONCLUSION

Based on the foregoing, we affirm in part and vacate in part the circuit court's June 18, 2014 Judgment, Guilty Conviction, and Sentence and remand the case to the circuit court for resentencing.

| | |
|---|---|
| William H. Jameson, Jr.<br>for defendant-appellant | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Donn Fudo for<br>plaintiff-appellee | /s/ Sabrina S. McKenna |

